## TRADE-MARK CASES.

### UNITED STATES v. STEFFENS; UNITED STATES v. WITTE-MANN; UNITED STATES v. JOHNSON.

1. Property in trade-marks has long been recognized and protected by the common law and by the statutes of the several States, and does not derive its existence from the act of Congress providing for the registration of them in the Patent Office.

2. A trade-mark is neither an invention, a discovery, nor a writing, within the meaning of the eighth clause of the eighth section of the first article of the Constitution, which confers on Congress power to secure for limited times to authors and inventors the exclusive right to their respective writings and discoveries.

3. If an act of Congress can in any case be extended, as a regulation of commerce, to trade-marks, it must be limited to their use in "commerce with foreign nations, and among the several States, and with the Indian tribes."

4. The legislation of Congress in regard to trade-marks is not, in its terms or essential character, a regulation thus limited, but in its language embraces, and was intended to embrace, all commerce, including that between citizens of the same State.

5. That legislation is void for want of constitutional authority, inasmuch as it is so framed that its provisions are applicable to all commerce, and cannot be confined to that which is subject to the control of Congress.

THE first two cases were brought here on certificates of division in opinion between the judges of the Circuit Court of the United States for the Southern District of New York. The last was brought here on a certificate of division in opinion between the judges of the Circuit Court of the United States for the Southern District of Ohio.

Steffens was indicted under the fourth and fifth sections of an act of Congress entitled "An Act to punish the counterfeiting of trade-marks and the sale or dealing in of counterfeit trade-mark goods," approved Aug. 14, 1876, 19 Stat. 141.

The first count in the indictment charges him with knowingly and wilfully having in his possession counterfeits and colorable imitations of the trade-marks of G. H. Mumm & Co., of Rheims, France, manufacturers and sellers of champagne wine.

The second count charges him with knowingly and wilfully selling counterfeited representations and colorable imitations of the trade-mark of said G. H. Mumm & Co.

Wittemann was indicted under the fifth section of that act. The indictment consists of six counts, and they charge : 1st, The counterfeiting and forging ; 2d, the having in possession colorable imitations of ; 3d, the buying: 4th, the selling; 5th, the offering for sale ; and, 6th, the dealing in colorable imitations of the private trade-mark belonging to and used by the firm of Kunkleman & Co., of Rheims, France, manufacturers and dealers in wine known as the "Piper Heidsick" brand of champagne wine.

Johnson, McNamara, and Reeder were prosecuted under that act by a criminal information containing seven counts, of which the first, fourth, and sixth are founded upon a trade-mark consisting of the letters "O K," registered in the United States Patent Office by Charles F. O'Donnell, April 2, 1878, for use upon packages of whiskey, and respectively charge the defendants with counterfeiting, affixing a colorable imitation, and dealing in and selling packages of whiskey to which was attached a colorable imitation of said trade-mark; and the second, third, fifth, and seventh counts are founded upon another trade-mark, consisting of a seal and ribbon, the latter secured by the seal of a package containing whiskey, registered by Charles F. O'Donnell, May 21, 1878, and respectively charge the defendants with counterfeiting, making a colorable imitation, affixing a colorable imitation, and dealing in packages of whiskey to which was attached a colorable imitation of said trade-mark.

Sects. 4 and 5 of the act of 1876 are as follows : —

"SECT. 4. That any person or persons who shall, with intent to defraud any person or persons, knowingly and wilfully cast, engrave, or manufacture, or have in his, her, or their possession, or buy, sell, offer for sale, or deal in, any die or dies, plate or plates, brand or brands, engraving or engravings, on wood, stone, metal, or other substance, moulds, or any false representation, likeness, copy, or colorable imitation of any die, plate, brand, engraving, or mould of any private label, brand, stamp, wrapper, engraving on paper or other substance, or trade-mark, registered pursuant to the statutes of the United States, shall, upon conviction thereof, be punished as prescribed in the first section of this act.

"SECT. 5. That any person or persons who shall, with intent to defraud any person or persons, knowingly and wilfully make,

forge, or counterfeit, or have in his, her, or their possession, or buy, sell, offer for sale, or deal in, any representation, likeness, similitude, copy, or colorable imitation of any private label, brand, stamp, wrapper, engraving, mould, or trade-mark, registered pursuant to the Statutes of the United States, shall, upon conviction thereof, be punished as prescribed in the first section of this act."

Sect. 4937, Rev. Stat., is as follows : —

"Any person or firm domiciled in the United States, and any corporation created by the authority of the United States, or of any State or Territory thereof, and any person, firm, or corporation resident of or located in any foreign country which by treaty or convention affords similar privileges to citizens of the United States, and who are entitled to the exclusive use of any lawful trade-mark, or who intend to adopt and use any trade-mark for exclusive use within the United States, may obtain protection for such lawful trade-mark, by complying with the following requirements : —

"*First*, By causing to be recorded in the Patent Office a statement specifying the names of the parties, and their residences and places of business, who desire the protection of the trade-mark ; the class of merchandise, and the particular description of goo ls comprised in such class, by which the trade-mark has been or is intended to be appropriated ; a description of the trade-mark itself, with fac-similes thereof, showing the mode in which it has been or is intended to be applied and used ; and the length of time, if any, during which the trade-mark has been in use.

"*Second*, By making payment of a fee of twenty-five dollars in the same manner and for the same purpose as the fee required for patents.

"*Third*, By complying with such regulations as may be pre scribed by the Commissioner of Patents."

To each indictment there was a general demurrer. The judges of the Circuit Court were opposed in opinion upon the following question : "Can the act of Congress, approved Aug. 14, 1876, entitled 'An Act to punish the counterfeiting of trade-mark goods and the sale or dealing in of counterfeit trade-mark goods,' under which this indictment is found, be upheld, wholly or in part, as a law necessary and proper for carrying into execution any of the powers vested in the Congress by the Constitution of the United States ? "

To the information against Johnson, McNamara, and Reeder there was a general demurrer, and thereupon a question arose for decision whether the said act of Congress " is within the constitutional power of Congress, or whether the same is unconstitutional, null, and void ; " and the opinions of the judges of the Circuit Court were opposed.

*The Attorney-General* for the United States.

The validity of the act of July 8, 1870, which provides for the registration of trade-marks, and gives remedies by civil actions for infringing them, was recognized by Mr. Justice Clifford, who delivered the opinion of the court in *McLean* v. *Fleming*, 96 U. S. 245. The first sentence of the opinion is as follows : —

" Protection for lawful trade-marks may be obtained by individuals, firms, or corporations entitled to the same if they comply with the requirements prescribed by the act of Congress ; and the provision is, that a trade-mark duly registered as required shall remain in force thirty years from the date of such registration, subject to an exception not necessary to be noticed. 16 Stat. 210 ; Rev. Stat., sects. 4937, 4941."

Here it is clearly intimated that protection for trade-marks is rightfully provided by that act. If it is invalid, no such protection could be in that mode obtained ; but if protection to trade-marks by civil remedies is within the power of Congress, so also are the statutes punishing as a crime the pirating upon property in them. But in that case, and in several others which are cited on the margin of page 955 of the Revised Statutes, the constitutionality of the act was not discussed. In them and others (*Smith* v. *Reynolds*, 10 Blatch. 85 ; *Smith* v. *Reynolds*, 13 id. 458 ; *Osgood* v. *Rockwood*, 11 id. 310 ; *Moorman* v. *Hodge*, 2 Saw. 78) it was assumed rather than directly affirmed.

In the sixth circuit Judge Swing pronounced the law to be constitutional. In the seventh circuit a contrary decision was made. In each case the question was argued and decided upon clause 8 of section 8, article 1, of the Constitution, and the opinion was advanced that it is the only provision by which the authority of Congress on the subject of trade-marks is conferred.

The argument drawn from the likeness which property in the use of trade-marks bears to that in patents and copyrights, and from the fact that Congress, in legislating upon these three matters, has, both in the original act and in the Revised Statutes, classed them together, demands careful consideration. Undoubtedly, in the legislative mind they were kindred subjects, and it was thought that the power of Congress over them might be derived from the same source.

I shall, however, not dwell upon this view of the question.

1. I maintain the constitutionality of the statute upon which the indictments and the information are found, upon the ground that it regulates commerce within the power given to Congress by clause 3 of section 8 of article 1 of the Constitution, which provides that the Congress shall have power " to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

" Commerce is a term of the largest import. It comprehends intercourse for the purposes of trade in any and all its forms, including transportation, purchase, sale, and exchange of commodities, between the citizens of our country and the citizens or subjects of other countries, and between the citizens of different States. The power to regulate it embraces all the instruments by which such commerce may be conducted. So far as some of these instruments are concerned, and some subjects which are local in their operation, it has been held that the States may provide regulations until Congress acts with reference to them ; but where the subject to which the power applies is national in its character, or of such a nature as to admit of uniformity of regulation, the power is exclusive of all State authority."   *Welton* v. *State of Missouri*, 91 U. S. 275.   This is a full and clear statement of what is meant by " commerce," and of the extent of the power of Congress over it.

The purchase and sale of commodities, then, are included in the term " commerce," and the power of Congress over it embraces all the instruments, aids, and appliances by which it is prosecuted.   True, such trade and intercourse must be foreign, or among the citizens of the different States, or with the Indian tribes; but if the instrumentalities employed as aids

to such trade and commerce are not local in their operation and are of such a nature as to admit of uniformity of regulation, the power of Congress not only applies to them, but is exclusive.

2. *Trade-marks* are important instrumentalities, aids, or appliances by which trade, especially in modern times, is conducted. They are the means by which manufacturers and merchants identify their manufactures and merchandise. They are the symbols by which men engaged in trade and manufactures become known in the marts of commerce, by which their reputation and that of their goods are extended and published; and as they become better known, the profits of their business are enhanced.

Hence the use of trade-marks has become universal, and in all trade and business of any extent they are *necessary* auxiliaries.

Among commercial nations there is a growing tendency to universal recognition of these emblems of commerce. Browne, Trade-Marks, sect. 302.

Their use as aids to the exchange of commodities in the great markets of the world is so generally recognized, and they are considered as so vitally important to the protection of commerce, that they have been made the subject of treaties between the United States and France, the German Empire, Belgium, Austria, Russia, and other powers. The English Merchandise Marks Act of 1862 affords the same protection to foreigners that it does to the subjects of Great Britain. Browne, Trade-Marks, p. 565.

3. The subject of trade-marks is not one of *local*, but of common, interest to all commercial nations. Their operation and the benefits derived from their use are not confined to particular localities, States, or countries. They not only admit, but in order to their efficiency require, uniformity of regulation.

4. Congress has endeavored to effect this uniformity, first, by providing for the registration of trade-marks, and, as remedies for the violation of the owners' rights in them, an action on the case for damages and a bill in equity to enjoin the offending party. Sects. 4937, 4941, 4942, Rev. Stat. But

these civil remedies proved inadequate to effectually prevent pirating upon trade-marks. They do not materially differ from those which previously existed.

Congress, then, following the examples of Prussia, France, and England (Browne, Trade-Marks, pp. 560–572), passed the act of Aug. 14, 1876, 19 Stat. 141. The offences therein defined are charged in the indictments and the information. Further specification is unnecessary; for the demurrers are general, and the ground of each is that the entire act is unconstitutional.

Its constitutionality in its application to the trade-marks of the *subjects of foreign countries* is the question presented by the indictments.

The purpose and the natural and reasonable effect of the acts are to protect the producer or the importer of foreign goods in his right of selling them in the United States, and thus carry out in good faith and enforce our treaty stipulations on the subject. The act is a regulation of foreign commerce.

The convention with France of the 16th of April, 1869 (16 Stat. 771), forbids the reproduction, in either of the two countries, of the trade-marks affixed to merchandise in the other, and gives the injured party an action for damages, just as if he were a citizen or subject of the country where the act of counterfeiting was committed.

It provides, in the second article, that the owners of trade-marks residing in either of the two countries, in order to secure their rights in the other, must deposit duplicate copies of their marks in the Patent Office at Washington, and in the clerk's office of the Tribunal of Commerce of the Seine at Paris.

Here is a mutual covenant concerning trade-marks. Whatever protection the laws of either country give to its own citizens or subjects is extended to the citizens or subjects of the other. Such is the intent of the treaty.

The law of France of June 23, 1857, provides not only a civil action, but also a criminal proceeding which prescribes severe penalties against those who counterfeit trade-marks, or in any way fraudulently deal in false representations of trade-marks. It declares that foreigners shall equally enjoy its benefits for

their products, if, in their countries, diplomatic conventions have established reciprocity of French marks. Browne, Trade-Marks, 569.

Congress, in order to afford an effective remedy for the evil, and extend the same protection to French importers that France gives to our producers and merchants in her markets, has enacted that the forger of trade-marks and the dealer in forged trade-marks shall answer at the bar of criminal justice in the courts of the United States.

The end is lawful, within the power of Congress; the means are appropriate.

But it is said that, in passing the statutes of Aug. 14, 1876, and July 8, 1870, Congress has exceeded its power, because in their application they cover cases arising wholly within the several States, and make acts committed within their jurisdiction — acts which are not directed against the operations of the general government — crimes against the United States; that they not only regulate foreign and inter-state commerce, but affect the domestic concerns of the several States.

The fraudulent dealing in trade-marks plainly interferes with and thwarts the power and duty of the United States to protect foreign and inter-state trade. Moreover, it is impossible to limit the effect of the wrong-doing within the confines of a State. It extends to all places where there is a market for the goods which are simulated by the false device.

But the answer to the objection is, that the subject of these statutes is a general interest of commerce upon which Congress has power to legislate. The operation of trade-marks is co-extensive with trade, and it is no objection to the law regulating them that it touches the internal concerns of a State.

In the *Wheeling Bridge Case* (18 How. 421), it was observed by the court: " It will not do to say that the exercise of an admitted power of Congress, conferred by the Constitution, is to be withheld, if it appears or can be shown that the effect and operation of the law may incidentally extend beyond the limitation of the power. Upon any such interpretation, the principal object of the framers of the instrument in conferring the power would be sacrificed to the subordinate consequences resulting from its exercise."

The power of Congress to tax imports is exclusive, and yet this constitutional provision very seriously limits the power of the States over their internal affairs.

It was held in *Brown* v. *Maryland* (12 Wheat. 419) that the States can in no way or manner tax the sale of imported goods before they are incorporated and mixed up with the mass of the property of the country.

Mr. Justice Strong, delivering the opinion of the court in *State Tax on Railway Gross Receipts* (15 'Wall. 284), construes the ruling in *Brown* v. *Maryland* as applying to other persons than the importers, who sell foreign goods by unbroken bale or package. See also *Welton* v. *State of Missouri*, 91 U. S. 275.

Here it is very plain that, by this authoritative exposition of the Constitution, not only the power of a State over its internal commerce, but its right to tax property within its jurisdiction, is interfered with and limited.

So, where States, in the exercise of their power to legislate concerning the police, morals, or health of the community, have endeavored to regulate the sale of particular articles, as of spirituous liquors, their laws are invalid, so far as they affect the sale of imported goods by the importer while they are in the original package and not mixed up with the general mass of salable commodities. *License Cases*, 5 How. 504; *Commonwealth* v. *Kimball*, 24 Pick. (Mass.) 359.

In *License Cases*, the court decided that a State might regulate the sale of liquors in the original packages *as imported* from another State, *in the absence of legislation by Congress upon the same subject;* but when Congress exercised its power to regulate inter-state commerce, State laws, so far as they conflict with the action of Congress, must yield. Here, too, the power of the States over their internal concerns is materially diminished.

So, also, in regard to the regulation of pilotage. That is within the power of Congress. *Cooley* v. *Board of Wardens*, 12 How. 299. A general law regulating pilotage upon all the navigable waters of the United States materially affects the internal commerce of many States, and yet parties have been indicted and convicted for a violation of its provisions. *United*

*States* v. *Farnham*, 2 Blatch. 528 ; *United States* v. *Warren*, 4 McLean, 463 ; *United States* v. *Taylor*, 5 id. 242.

In the regulation of trade with the Indian tribes the action of the law, especially when the Constitution was adopted, was chiefly within a State ; but the court asserted that " the power of Congress comprehends navigation *within the limits* of every State in the Union, so far as that navigation may be in any manner connected with commerce with foreign nations, or among the several States, or with the Indian tribes." *Gibbins* v. *Ogden*, 9 Wheat. 1.

In this connection I refer to *United States* v. *Holliday* (3 Wall. 407) and *United States* v. *Forty-three Gallons of Whiskey*, 93 U. S. 188.

Congress having power to legislate upon the subject of trade-marks as a general interest of commerce, it is submitted that the legislation of Congress, the purpose of which is to give them uniform protection throughout the country, is constitutional, however it may affect the internal affairs of the States.

If it be insisted by the defendants that the act by its terms can also be applied to trade-marks for goods not intended for inter-state or foreign commerce, the reply is, that, excluding from operation the provisions which are in that regard objectionable, a valid enactment, susceptible of being enforced in all proper cases, may remain. Where a law which is constitutional under certain limitations exceeds them, it may still be operative within its legitimate sphere, and be void only for the excess.

*Mr. George Hoadly, contra.*

MR. JUSTICE MILLER delivered the opinion of the court.

The three cases whose titles stand at the head of this opinion are criminal prosecutions for violations of what is known as the trade-mark legislation of Congress. The first two are indictments in the southern district of New York, and the last is an information in the southern district of Ohio. In all of them the judges of the circuit courts in which they are pending have certified to a difference of opinion on what is substantially the same question ; namely, are the acts of Congress on the subject

of trade-marks founded on any rightful authority in the Constitution of the United States?

The entire legislation of Congress in regard to trade-marks is of very recent origin. It is first seen in sects. 77 to 84, inclusive, of the act of July 8, 1870, entitled "An Act to revise, consolidate, and amend the statutes relating to patents and copyrights." 16 Stat. 198. The part of this act relating to trade-marks is embodied in chap. 2, tit. 60, sects. 4937 to 4947, of the Revised Statutes.

It is sufficient at present to say that they provide for the registration in the Patent Office of any device in the nature of a trade-mark to which any person has by usage established an exclusive right, or which the person so registering intends to appropriate by that act to his exclusive use; and they make the wrongful use of a trade-mark, so registered, by any other person, without the owner's permission, a cause of action in a civil suit for damages. Six years later we have the act of Aug. 14, 1876 (19 Stat. 141), punishing by fine and imprisonment the fraudulent use, sale, and counterfeiting of trademarks registered in pursuance of the statutes of the United States, on which the informations and indictments are founded in the cases before us.

The right to adopt and use a symbol or a device to distinguish the goods or property made or sold by the person whose mark it is, to the exclusion of use by all other persons, has been long recognized by the common law and the chancery courts of England and of this country, and by the statutes of some of the States. It is a property right for the violation of which damages may be recovered in an action at law, and the continued violation of it will be enjoined by a court of equity, with compensation for past infringement. This exclusive right was not created by the act of Congress, and does not now depend upon it for its enforcement. The whole system of trade-mark property and the civil remedies for its protection existed long anterior to that act, and have remained in full force since its passage.

These propositions are so well understood as to require neither the citation of authorities nor an elaborate argument to prove them.

As the property in trade-marks and the right to their exclusive use rest on the laws of the States, and, like the great body of the rights of person and of property, depend on them for security and protection, the power of Congress to legislate on the subject, to establish the conditions on which these rights shall be enjoyed and exercised, the period of. their duration, and the legal remedies for their enforcement, if such power exist at all, must be found in the Constitution of the United States, which is the source of all the powers that Congress can lawfully exercise.

In the argument of these cases this seems to be conceded, and the advocates for the validity of the acts of Congress on this subject point to two clauses of the Constitution, in one or in both of which, as they assert, sufficient warrant may be found for this legislation.

The first of these is the eighth clause of sect. 8 of the first article. That section, manifestly intended to be an enumeration of the powers expressly granted to Congress, and closing with the declaration of a rule for the ascertainment of such powers as are necessary by way of implication to carry into efficient operation those expressly given, authorizes Congress, by the clause referred to, " to promote the progress of science and useful arts, by securing for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries."

As the first and only attempt by Congress to regulate the *right of trade-marks* is to be found in the act of July 8, 1870, to which we have referred, entitled "An Act to revise, consolidate, and amend the statutes relating to *patents* and *copyrights*," terms which have long since become technical, as referring, the one to inventions and the other to the writings of authors, it is a reasonable inference that this part of the statute also was, in the opinion of Congress, an exercise of the power found in that clause of the Constitution. It may also be safely assumed that until a critical examination of the subject in the courts became necessary, it was mainly if not wholly to this clause that the advocates of the law looked for its support.

Any attempt, however, to identify the essential characteristics of a trade-mark with inventions and discoveries in the

arts and sciences, or with the writings of authors, will show that the effort is surrounded with insurmountable difficulties.

The ordinary trade-mark has no necessary relation to invention or discovery. The trade-mark recognized by the common law is generally the growth of a considerable period of use, rather than a sudden invention. It is often the result of accident rather than design, and when under the act of Congress it is sought to establish it by registration, neither originality, invention, discovery, science, nor art is in any way essential to the right conferred by that act. If we should endeavor to classify it under the head of writings of authors, the objections are equally strong. In this, as in regard to inventions, originality is required. And while the word *writings* may be liberally construed, as it has been, to include original designs for engravings, prints, &c., it is only such as are *original*, and are founded in the creative powers of the mind. The writings which are to be protected are *the fruits of intellectual labor*, embodied in the form of books, prints, engravings, and the like. The trademark may be, and generally is, the adoption of something already in existence as the distinctive symbol of the party using it. At common law the exclusive right to it grows out of its *use*, and not its mere adoption. By the act of Congress this exclusive right attaches upon registration. But in neither case does it depend upon novelty, invention, discovery, or any work of the brain. It requires no fancy or imagination, no genius, no laborious thought. It is simply founded on priority of appropriation. We look in vain in the statute for any other qualification or condition. If the symbol, however plain, simple, old, or well-known, has been first appropriated by the claimant as his distinctive trade-mark, he may by registration secure the right to its exclusive use. While such legislation may be a judicious aid to the common law on the subject of trade-marks, and may be within the competency of legislatures whose general powers embrace that class of subjects, we are unable to see any such power in the constitutional provision concerning authors and inventors, and their writings and discoveries.

The other clause of the Constitution supposed to confer the requisite authority on Congress is the third of the same section,

which, read in connection with the granting clause, is as follows :
" The Congress shall have power to regulate commerce with
foreign nations, and among the several States, and with the
Indian tribes."

The argument is that the use of a trade-mark — that which
alone gives it any value — is to identify a particular class or
quality of goods as the manufacture, produce, or property of
the person who puts them in the general market for sale ; that
the sale of the article so distinguished is commerce ; that the
trade-mark is, therefore, a useful and valuable aid or instrument
of commerce, and its regulation by virtue of the clause belongs
to Congress, and that the act in question is a lawful exercise of
this power.

Every species of property which is the subject of commerce,
or which is used or even essential in commerce, is not brought
by this clause within the control of Congress.   The barrels
and casks, the bottles and boxes in which alone certain articles
of commerce are kept for safety and by which their contents
are transferred from the seller to the buyer, do not thereby
become subjects of congressional legislation more than other
property.   *Nathan* v. *Louisiana*, 8 How. 73.   In *Paul* v. *Virginia* (8 Wall. 168), this court held that a policy of insurance
made by a corporation of one State on property situated in another, was not an article of commerce, and did not come within
the purview of the clause we are considering.   " They are not,"
says the court, " commodities to be shipped or forwarded from
one State to another, and then put up for sale."   On the other
hand, in *Almy* v. *State of California* (24 How. 169), it was
held that a stamp duty imposed by the legislature of California
on bills of lading for gold and silver transported from any
place in that State to another out of the State, was forbidden
by the Constitution of the United States, because such instruments being a necessity to the transaction of commerce, the
duty was a tax upon exports.

The question, therefore, whether the trade-mark bears such
a relation to commerce in general terms as to bring it within
congressional control, when used or applied to the classes of
commerce which fall within that control, is one which, in the
present case, we propose to leave undecided.   We adopt this

course because when this court is called on in the course of the administration of the law to consider whether an act of Congress, or of any other department of the government, is within the constitutional authority of that department, a due respect for a co-ordinate branch of the government requires that we shall decide that it has transcended its powers only when that is so plain that we cannot avoid the duty.

In such cases it is manifestly the dictate of wisdom and judicial propriety to decide no more than is necessary to the case in hand. That such has been the uniform course of this court in regard to statutes passed by Congress will readily appear to any one who will consider the vast amount of argument presented to us assailing them as unconstitutional, and he will count, as he may do on his fingers, the instances in which this court has declared an act of Congress void for want of constitutional power.

Governed by this view of our duty, we proceed to remark that a glance at the commerce clause of the Constitution discloses at once what has been often the subject of comment in this court and out of it, that the power of regulation there conferred on Congress is limited to commerce with foreign nations, commerce among the States, and commerce with the Indian tribes. While bearing in mind the liberal construction, that commerce with foreign nations means commerce between citizens of the United States and citizens and subjects of foreign nations, and commerce among the States means commerce between the individual citizens of different States, there still remains a very large amount of commerce, perhaps the largest, which, being trade or traffic between citizens of the same State, is beyond the control of Congress.

When, therefore, Congress undertakes to enact a law, which can only be valid as a regulation of commerce, it is reasonable to expect to find on the face of the law, or from its essential nature, that it is a regulation of commerce with foreign nations, or among the several States, or with the Indian tribes. If not so limited, it is in excess of the power of Congress. If its main purpose be to establish a regulation applicable to all trade, to commerce at all points, especially if it be apparent that it is designed to govern the commerce wholly between citizens of

the same State, it is obviously the exercise of a power not confided to Congress.

We find no recognition of this principle in the chapter on trade-marks in the Revised Statutes. We would naturally look for this in the description of the class of persons who are entitled to register a trade-mark, or in reference to the goods to which it should be applied. If, for instance, the statute described persons engaged in a commerce between the different States, and related to the use of trade-marks in such commerce, it would be evident that Congress believed it was acting under the clause of the Constitution which authorizes it to regulate commerce among the States. So if, when the trade-mark has been registered, Congress had protected its use on goods sold by a citizen of one State to another, or by a citizen of a foreign State to a citizen of the United States, it would be seen that Congress was at least intending to exercise the power of regulation conferred by that clause of the Constitution. But no such idea is found or suggested in this statute. Its language is : "Any person or firm domiciled in the United States, and any corporation created by the United States, or of any State or Territory thereof," or any person residing in a foreign country which by treaty or convention affords similar privileges to our citizens, may by registration obtain protection for his trade-mark. Here is no requirement that such person shall be engaged in the kind of commerce which Congress is authorized to regulate. It is a general declaration that anybody in the United States, and anybody in any other country which permits us to do the like, may, by registering a trade-mark, have it fully protected. So, while the person registering is required to furnish "a statement of the class of merchandise, and the particular description of the goods comprised in such class, by which the trade-mark has been or is intended to be appropriated," there is no hint that the goods are to be transported from one State to another, or between the United States and foreign countries. Sect. 4939 is intended to impose some restriction upon the Commissioner of Patents in the matter of registration, but no limitation is suggested in regard to persons or property engaged in the different classes of commerce mentioned in the Constitution. The remedies provided by the act

when the right of the owner of the registered trade-mark is infringed, are not confined to the case of a trade-mark used in foreign or inter-state commerce.

It is therefore manifest that no such distinction is found in the act, but that its broad purpose was to establish a universal system of trade-mark registration, for the benefit of all who had already used a trade-mark, or who wished to adopt one in the future, without regard to the character of the trade to which it was to be applied or the residence of the owner, with the solitary exception that those who resided in foreign countries which extended no such privileges to us were excluded from them here.

It has been suggested that if Congress has power to regulate trade-marks used in commerce with foreign nations and among the several States, these statutes shall be held valid in that class of cases, if no further. To this there are two objections: First, the indictments in these cases do not show that the trade-marks which are wrongfully used were trade-marks used in that kind of commerce. Secondly, while it may be true that when one part of a statute is valid and constitutional, and another part is unconstitutional and void, the court may enforce the valid part where they are distinctly separable so that each can stand alone, it is not within the judicial province to give to the words used by Congress a narrower meaning than they are manifestly intended to bear in order that crimes may be punished which are not described in language that brings them within the constitutional power of that body. This precise point was decided in *United States* v. *Reese*, 92 U. S. 214. In that case Congress had passed a statute punishing election officers who should refuse to any person lawfully entitled to do so the right to cast his vote at an election. This court was of the opinion that, as regarded the section of the statute then under consideration, Congress could only punish such denial when it was on account of race, color, or previous condition of servitude.

It was urged, however, that the general description of the offence included the more limited one, and that the section was valid where such was in fact the cause of denial. But the court said, through the Chief Justice: " We are not able to

reject a part which is unconstitutional and retain the remainder, because it is not possible to separate that which is constitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not there now. Each of the sections must stand as a whole, or fall altogether. The language is plain. There is no room for construction, unless it be as to the effect of the Constitution. The question, then, to be determined is, whether we can introduce words of limitation into a penal statute so as to make it specific, when, as expressed, it is general only. . . . To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty." If we should, in the case before us, undertake to make by judicial construction a law which Congress did not make, it is quite probable we should do what, if the matter were now before that body, it would be unwilling to do; namely, make a trade-mark law which is only partial in its operation, and which would complicate the rights which parties would hold, in some instances under the act of Congress, and in others under State law. Cooley, Const. Lim. 178, 179; *Commonwealth* v. *Hitchings*, 5 Gray (Mass.), 482.

In what we have here said we wish to be understood as leaving untouched the whole question of the treaty-making power over trade-marks, and of the duty of Congress to pass any laws necessary to carry treaties into effect.

While we have, in our references in this opinion to the trade-mark legislation of Congress, had mainly in view the act of 1870, and the civil remedy which that act provides, it was because the criminal offences described in the act of 1876 are, by their express terms, solely referable to frauds, counterfeits, and unlawful use of trade-marks which were registered under the provisions of the former act. If that act is unconstitutional, so that the registration under it confers no lawful right, then the criminal enactment intended to protect that right falls with it.

The questions in each of these cases being an inquiry whether these statutes can be upheld in whole or in part as valid and constitutional, must be answered in the negative; and it will be

*So certified to the proper circuit courts.*