MANHATTAN TRUST CO. et al. v. CITY OF DAYTON.

(Circuit Court of Appeals, Sixth Circuit. December 9, 1893.)

No. 114.

1. MUNICIPAL CORPORATIONS—CONTRACTS—GAS COMPANIES
   When a municipal council is authorized by statute to contract for a period not exceeding 10 years, its contract for 20 years, or for an indefinite time, cannot be sustained as a contract for 10 years, but is entirely void.

2. SAME—ORDINANCES—CONSTRUCTION.
   Under a statute empowering municipal councils to regulate, from time to time, the price of gas, and authorizing them to bind themselves by contract not to reduce the price below an agreed minimum for 10 years, a council contracted for minimum schedule rates by "mixer measurement" for 5 years. Afterwards it passed an ordinance providing in one section that consumers might elect to have gas furnished by meter instead of at the schedule rates, in which case a maximum price was fixed, without any limitation of time. A subsequent section declared that the contract before made should continue in force, "except as herein altered" for the unexpired time thereof. *Held,* that the provision for a maximum price was not a contract for any period, but was an exercise of the power to regulate, and a limitation on the license granted, and continued in force after the expiration of the original contract, and until repealed. 55 Fed. 181, affirmed.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

In Equity. Petition by the city of Dayton, Ohio, intervening in a suit by the Manhattan Trust Company against the Dayton Natural Gas Company. Heard on demurrer to the answers of complainant and the receiver of the gas company to the intervening petition. The demurrers were sustained, and the receiver was enjoined from charging more for gas than the rates fixed by ordinance. 55 Fed. p. 181. The trust company and the receiver appeal. Affirmed.

The Dayton Natural Gas Company is an Ohio corporation, organized originally under the name of the Southwestern Ohio Natural Gas & Petroleum Oil Company. On the 18th of March, 1887, the city council of Dayton, Ohio, by ordinance, authorized said corporation to occupy streets, alleys, and public grounds of the city, and lay pipes for the purpose of furnishing gas to the public and to private citizens. By the terms of the ordinance it had 18 months within which to introduce gas into the city, under penalty of forfeiture of all the rights under the ordinance. The company accepted the ordinance, and executed the bond as required by it, and began the work of establishing itself within the city. It failed, however, to introduce gas

by January 1, 1889, and in consequence of this failure the city council, by resolution, in pursuance of the reserved power mentioned in the ordinance, declared all the rights granted thereby forfeited. Prior to this forfeiture, and on the 23d of December, 1887, the council had passed an ordinance regulating the price to be charged by the gas company for natural gas to be furnished by it for fuel purposes for and during a period of five years next ensuing from and after the date at which the ordinance should take effect, which was to be at the expiration of 10 days from the date of its first publication. The schedule of prices contained in that ordinance related alone to gas to be furnished for fuel purposes by "mixer measurement." Section 2 of the ordinance was in these words: "The foregoing is fixed as the minimum price at which said city council requires said company to furnish gas to the citizens of said city, and for the public buildings of said city, for said term of five years, and said company is hereby required to assent thereto by written acceptance, filed in the office of the city clerk of said city." This ordinance was duly accepted by the gas company.

On the 28th of March, 1889, the name of the company having been changed to the Dayton Natural Gas Company, an ordinance was passed by the city of Dayton, granting to the company "the right and privilege to lay, maintain and operate pipes in the city for the purpose of supplying natural gas for heating, fuel and power purposes only." This ordinance was in the following words and figures:

"Section 1. Be it ordained by the city council of the city of Dayton, that, subject to the terms, conditions and limitations of this ordinance, there is granted to the Dayton Natural Gas Company, its successors and assigns, the right and privilege, for the term of twenty years, to lay, maintain and operate mains, pipes, branches and conduits through the streets, lanes, alleys, avenues and public grounds of said city for the purpose of supplying said city and its inhabitants with natural gas, or produced gas, for heating, fuel and power purposes only.

"Sec. 2. Before said company shall do any work or lay any pipes, it shall execute a bond to the city of Dayton in the penal sum of $50,000, to the acceptance of the city council of said city, with not less than five sureties thereon, three of whom shall be residents of said city, conditioned as follows:

"(1) That said company shall proceed within ten days after being notified so to do by the city civil engineer of said city, to repair and place in good condition the streets, avenues, lanes and alleys of said city, where pipes have heretofore been laid or work done by said company, or by the S. W. O. N. G. & P. O. Co., and prosecute said work with diligence.

"(2) That said company will not in any manner molest, damage or interfere with any of the gas or water pipes, or public or private sewers now laid or constructed in or along any of the streets, avenues, lanes, alleys or public grounds of said city.

"(3) That said company will restore any and all streets, avenues, lanes, alleys and public grounds in which it may lay pipes, or which it shall disturb or interfere with in laying pipes, to as good condition as they were before the laying of said pipes.

"(4) That said company will, without delay, remove from the streets, avenues, lanes, alleys and public grounds all dirt or rubbish caused by the laying of said pipes.

"(5) That said company will reimburse said city for all money expended in restoring any street, avenue, lane, alley or public place, or any part thereof, to as good condition as the same was before the same was opened for the purpose of laying pipes therein; and for all money expended for clearing away any dirt or rubbish caused by the laying of pipes, as aforesaid, where said company has failed to so restore the condition of any street, avenue, lane, alley or public place, or to remove such rubbish or dirt within ten days after receiving written notice from the city civil engineer so to do.

"(6) That it shall indemnify and save harmless the said city from and against any and all claims, demands, suits or liabilities of any kind that said city may be subjected to or incurred by reason of or growing out of the opening of said streets, avenues, lanes, alleys and public places, or the laying of pipes therein, or of permitting or of having such gas within

the city, or in the said pipes, or the doing of work incident to this grant, or in consequence of injuries or damages to persons or property by such gas, or by reason of any explosion of such gas, or growing out of the failure of said company to restore the streets, avenues, lanes, alleys and public places as aforesaid, it being the intention that said company shall be primarily liable as between it and the city in all such cases.

"Sec. 3. The city council may, at any time, require the renewal of said bond, when in its judgment it has become insufficient.

"Sec. 4. Whenever said city shall determine to construct any sewer in or along any street, avenue, lane, alley or public place where any pipe of said company is laid, said company shall, at its own expense, lower, elevate, change, or remove any such pipe, so that such sewer may be constructed as desired by the city.

"Sec. 5. All pavements, sidewalks, curbstones, gutters, streets, lanes, alleys, avenues or public grounds disturbed or injured by said company, in any manner or by any means, shall at once be placed in as good condition as it was before so injured or disturbed.

"Sec. 6. All work in laying or repairing pipes shall be prosecuted in such a manner as not to interfere with the use or travel upon the streets, avenues, alleys, lanes or public places of said city, where it can be avoided, and when such use is unavoidably obstructed by said company it shall, with reasonable dispatch, repair and replace such street, avenue, lane, alley, or public place.

"Sec. 7. All pipes, mains, and apparatus of every kind used by said company shall be of the most improved design and quality. All pipes shall be of standard weight, and be so laid as not to interfere with the use of the streets, avenues, alleys, lanes and public places after same are in place.

"Sec. 8. In order to provide against gas that may escape from high and low pressure mains and pipes from passing into cellars, sewers and buildings, it shall be, and is hereby, made the duty of said company to furnish and supply perforated stop-box lids on all stop-boxes. Gauges showing the amount of pressure on all natural gas lines shall be erected in the city civil engineer's office, at the expense of the company, and there shall be as many gauges as are necessary to indicate the pressure upon all low pressure lines in said city.

"Sec. 9. Said company shall at all times maintain pressure for domestic use of not less than four ounces nor more than eight ounces to the square inch, at the point of consumption.

"Sec. 10. Any consumer within said city shall have the right to require gas to be furnished by meter measurement, and not by the schedule rates; in cases where a meter is used, said company shall have the right to charge and receive any sum not exceeding ten cents per thousand cubic feet, if paid within ten days, or twelve and one-half cents per thousand cubic feet, if not so paid, for the gas used. Such meter shall be furnished and set in place upon the application of any consumer, without cost to such consumer, by said company; but said company shall be entitled to charge a rent of three dollars per year in advance therefor.

"Sec. 11. For all manufacturing purposes, natural gas shall be supplied and furnished at the option of the consumer. First, at not to exceed seventy-five per cent of the cost of coal; or, second, by special agreement, and in that event, at the same rate to all, whether large or small consumers, and in no case shall preference be given in price to one consumer over another; or, third, by meter measurements, not exceeding ten cents per one thousand cubic feet, if paid within ten days, as heretofore provided, the meter to be furnished and set by the company without cost to the consumer, but at the same rent and terms as heretofore named.

"Sec. 12. Said company may cut off the gas from any consumer in case of ten days' default after bills are due in the payment. But when payment is made, gas shall again be furnished to such consumer, on his request.

"Sec. 13. Said company shall be compelled to furnish gas to all applicants, whenever applied for. Said company shall, within ninety days after being ordered so to do by the council, lay pipes in any streets, lanes, avenues, alleys or public places, contiguous to streets, etc., where their pipes are

then laid, provided that, in the opinion of said city council, the amount of gas consumed by such parties will justify the laying of said pipes and making said connections, and provided one-fifth in number of the owners of property upon the line of such extension agree to subscribe for gas.

"Sec. 14. Said company shall supply natural gas to consumers and to said city so long as said gas shall last. Said company shall supply gas to the city building, without cost to the city, sufficient to heat said building. The council of said city shall appoint a proper person to superintend the laying of pipe and repairing of streets, etc., while said line is in process of construction, and said company shall pay the salary of said person, said salary not exceeding twelve hundred dollars per year, to be fixed by council.

"Sec. 15. Mixers numbered as follows shall have openings of the following diameter through them:

No. 3, 3–32 of an inch.
No. 5, 4–32 of an inch.
No. 7, 5–32 of an inch.
No. 9, 6–32 of an inch.

"Mixers designated by letters shall have openings of the following diameter through them:

Mixer A, 6–32 of an inch.
Mixer B, 7–32 of an inch.
Mixer C, 8–32 of an inch.
Mixer D, 9–32 of an inch.
Mixer E, 10–32 of an inch.
Mixer F, 11–32 of an inch.

"The thickness of metal through which the outlet for gas is made in the mixer, should not exceed three-sixteenths of an inch. Any of the above mixers shall be used when required by persons wishing quantity of gas they will supply. Inch measurements above refer to regulation sizes. The contract heretofore made between the city and this company, as to schedule of prices, shall be in full force except as herein altered, and for the unexpired time of said original contract, and all property rights heretofore acquired by this company shall be preserved to it, except as modified herein.

"Sec. 16. Said company shall, at its own expense, furnish and lay all service pipe to the curb line of streets.

"Sec. 17. In prosecuting the work of laying pipes, said company shall be subject to all general ordinances of the city of Dayton, not inconsistent with this ordinance.

"Sec. 18. Whenever the said council of said city shall determine to pave any of the streets of said city, said company shall, if required to do so by resolution of said city council, lay down its mains and service pipes in and along such streets to be improved at such times as the city council may direct.

"Sec. 19. If said company shall willfully violate any of the provisions of this ordinance, directing anything to be done, or enjoining the doing of anything, it shall be liable to the city in the sum of two hundred dollars, as liquidated damages, to be recovered in a civil action.

"Sec. 20. That this ordinance shall take effect at the date when said company shall file its written acceptance of the provisions hereof with the city clerk of said city."

Under the bill filed in the circuit court of the United States for the southern district of Ohio, western division, by the complainant, the Manhattan Trust Company, the property of the defendant gas company was placed in the control of a receiver appointed by that court, who at once qualified and took possession. The receiver, claiming that after the expiration of the term of five years mentioned in the ordinance of December 23, 1887, fixing the schedule of prices for gas furnished through mixers, there was no rate fixed by ordinance or agreement from and after the 10th of January, 1893, proceeded to carry into effect a resolution of the defendant company, passed in December, 1892, in anticipation of the termination of the contract created by the ordinance of December, 1887, advanced the rate of gas to 20 cents per 1,000 cubic feet to all consumers, and sent out his bills accordingly. The city of Dayton filed its intervening petition in the cause, alleging

that the action of the receiver in charging a rate in excess of 10 cents per 1,000 cubic feet was in violation of the ordinance of the city passed March 27, 1889. This petition was answered by the Manhattan Trust Company, and by the receiver, setting up the various ordinances and agreements heretofore mentioned, and insisting that 10 cents per 1,000 cubic feet was an absolutely inadequate price, and ruinous to the interest committed to the control and custody of the receiver; and that, after the expiration of five years after the passage of the ordinance of December 23, 1887, there was no agreement between the city of Dayton and the gas company, and that there was no ordinance in force affecting the price to be charged for gas by the gas company. These answers were demurred to, and stricken from the files, and the receiver restrained by order of the court from accepting more than 10 cents per 1,000 cubic feet, which was to be credited upon the bills sent out, subject to and until further order of the court. From this order of the court enjoining the receiver from collecting more than 10 cents per 1,000 cubic feet, the Manhattan Trust Company and the receiver have appealed.

Wm. B. Richie, John A. McMahon, and Lawrence Maxwell, Jr., for appellants.

Craighead & Conover, for appellees.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after stating the facts, delivered the opinion of the court.

The controversy involved on this appeal is as to the price to be charged the citizens of Dayton, Ohio, by the receiver of the natural gas company, and arises upon the intervening petition of the city of Dayton, the answers of the Manhattan Trust Company, and of the receiver.

The contention of the receiver is that there is no agreement between the gas company and the city as to the price, and no ordinance in force regulating the price; that the price of 10 cents per 1,000 cubic feet is an absolutely inadequate price, and ruinous to the interests of the property committed to his management as receiver; and that the charge of 20 cents per 1,000 cubic feet, demanded by him, is reasonable and just. The city, on the other hand, insists that section 10 of the ordinance of March 28, 1889, is in force, and operates as a maximum upon the price of gas furnished consumers by meter measurement. The question turns upon the construction of the ordinances of the city of Dayton passed December 23, 1887, and March 28, 1889, viewed in the light of sections 2478 and 2479 of the Revised Statutes of Ohio. These sections read as follows:

"Sec. 2478. The council of any city or village in which electric lighting companies, natural or artificial gas companies, or gas light or coke companies may be established, or into which their wires, mains or pipes may be conducted, are hereby empowered to regulate, from time to time, the prices which said electric lighting, natural or artificial gas, or gas and coke companies, may. charge for electric light, or for gas for lighting or fuel purposes, furnished by such companies to the citizens, public grounds and buildings, streets, lanes, alleys, avenues, wharves and landing places; and such electric lighting, natural or artificial gas, or gas light and coke companies, shall in no event charge more for any electric light, or natural or artificial gas, furnished to such corporation or individuals than the price specified by

ordinance of such council; and such council shall also have power to regulate and fix the price which such companies shall charge for rent of their meters.

"Sec. 2479. In case the council fixes the minimum price at which it requires any company to furnish gas to the citizens, or public buildings, or for the purpose of lighting the streets, alleys, avenues, wharves, landing places and public grounds, for a period not exceeding ten years, and the company assents thereto by written acceptance, filed in the office of the clerk of the corporation, it shall not be lawful for the council to require such company to furnish gas at a less price during the period of time agreed on, not exceeding ten years. as aforesaid."

Under the latter section it was clearly within the power of the council to fix a minimum price at which it would require gas to be furnished for a period "not exceeding ten years." Upon the assent of the company, "by written acceptance filed in the office of the clerk of the corporation," the act makes it unlawful for the council to require gas to be furnished at a less price during the period of time agreed on, not exceeding 10 years.

The price ordinance of December 23, 1887, was a clear exercise of this limited power of contract. The ordinance was, in terms, limited to a period of 5 years from and after 10 days after the date of its first publication, and therefore expired by its own limitation on the 10th of January, 1893. It follows, therefore, that if that is the only price ordinance bearing upon this gas company, it has expired by its own terms, and there is now no agreement or ordinance regulating the charge to consumers.

But the petitioner insists that by section 10 of the ordinance of March 28, 1889, a maximum rate is fixed for gas furnished by meter measurement, and an option given consumers to require meter measurement. That section reads as follows:

"Any consumer within said city shall have the right to require gas to be furnished by meter measurement, and not by the schedule rates; in cases where a meter is used, said company shall have the right to charge and receive any sum not exceeding ten cents per thousand cubic feet, if paid within ten days, or twelve and one-half cents per thousand cubic feet, if not so paid, for the gas used. Such meter shall be furnished and set in place upon the application of any consumer, without cost to such consumer, by said company; but said company shall be entitled to charge a rent of three dollars per year in advance therefor."

If this section is to be construed as a regulation of the price for gas furnished consumers under and by virtue of the power conferred by section 2478, above cited, and is still in force as general legislation, then the controversy is closed, and the receiver must comply with an ordinance clearly within the power of the council to enact. So, if it is to be regarded as a limitation imposed upon the license authorizing the gas company to enter upon the public streets of Dayton, and establish itself there as a gas company, it would be a valid legislative limitation upon the gas company so long as it remained unaltered or unrepealed.

With regard to this section, the insistence of the learned counsel for appellants is, as set down in the brief:

"First. It is not a limitation upon the power of the company for the period of twenty years.

"Second. It is not a contract for that period, it being manifestly beyond the power of council to enter into such contract; nor is it a contract by construction for ten years, a period within its power.

"Third. But it was a contract for the unexpired term of five years from January 10, 1888, (when the price ordinance of December 23, 1887, took effect), being, in effect, an amendment of that ordinance."

We quite agree with counsel as to the second of these propositions. The ordinance of which section 10 is a part does not by any fair and reasonable construction purport to be an agreement under section 2479, Rev. St. Ohio, for a period of 20 years. An agreement for such a term would be ultra vires, and it is not to be lightly assumed that the legislative body of the city deliberately undertook to do a vain thing, expressly prohibited by the plain terms of the act giving it the right to make an agreement for a term not exceeding 10 years. Neither can it, by construction, be regarded as an agreement for the term of 10 years. Such a construction could only be reached by the insertion of a term of limitation where none was inserted, or by substituting one term for another. That would be to make a contract for the parties. The section is not so worded as to enable the court to separate the lawful from the unlawful. The contract must stand or fall dependent upon the validity or invalidity of the ordinance as it was enacted. Trist v. Child, 21 Wall. 441.

In U. S. v. Reese, 92 U. S. 214, a like question arose. Congress had passed a statute punishing election officers who should refuse to allow any person lawfully entitled to do so the right to cast his vote in an election. The supreme court held that congress could only punish such denial when it was on account of race, color, or previous condition of servitude.

"It was agreed," says Mr. Justice Miller, in the Trade-Mark Case, 100 U. S. 98, "that the general description of the offense included the more limited one, and that the section was valid where such was in fact the cause of denial. But the court said, through the chief justice: 'We are not able to reject a part which is unconstitutional, and retain the remainder, because it is not possible to separate that which is constitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not there now. Each of the sections must stand as a whole, or fall altogether. The language is plain. There is no room for construction, unless it be as to the effect of the constitution. The question, then, to be determined, is whether we can introduce words of limitation into a penal statute so as to make it specific, when, as expressed, it is general only. * * * To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty.' If we should, in the case before us, undertake to make, by judicial construction, a law which congress did not make, it is quite probable we should do what, if the matter were now before that body, it would be unwilling to do, namely, make a trade-mark law which is only partial in its operation, and which would complicate the rights which parties would hold, in some instances under the act of congress, and in others under state law."

Cooley, Const. Lim. 178, 179; Com. v. Hitchings, 5 Gray, 482.

We cannot venture to say that an agreement for an indefinite time, or for 20 years,—a time beyond the power of the council,—is to be construed in either case as by construction an agreement for 10

years, because it was within the power of the council to have made an agreement for that time, or for any time short of that time.

.This brings us to the question of real difficulty,—that covered by the third contention of appellants, viz. that section 10 is to be construed as an agreement for the unexpired term of the contract as to price contained in the ordinance of December, 1887. This contention is entirely based upon the meaning and legal effect of the provision of section 15 of the ordinance of March 28, 1889, in these words:

"Mixers numbered as follows shall have openings of the following diameter through them:

No. 3, 3–32 of an inch.
No. 5, 4–32 of an inch.
No. 7, 5–32 of an inch.
No. 9, 6–32 of an inch.

"Mixers designated by letters shall have openings of the following diameter through them:

Mixer A, 6-32 of an inch.
Mixer B, 7-32 of an inch.
Mixer C, 8-32 of an inch.
Mixer D, 9-32 of an inch.
Mixer E, 10-32 of an inch.
Mixer F, 11-32 of an inch.

"The thickness of metal through which the outlet for gas is made in the mixer, should not exceed three-sixteenths of an inch. Any of the above mixers shall be used when required by persons wishing quantity of gas they will supply. Inch measurements above refer to regulation sizes. The contract heretofore made between the city and this company, as to schedule of prices, shall be in full force except as herein altered, and for the unexpired time of said original contract, and all property rights heretofore acquired by this company shall be preserved to it, except as modified herein."

This clearly has reference to the schedule of prices for gas supplied through mixers found in the ordinance of December, 1887. The contractual character of that ordinance, it having been accepted by the gas company, is recognized, and that agreement is proposed to be revised, "except as herein altered, and for the unexpired term of said ordinance." The words, "as herein altered," refer, as we think, to the alteration contained in this section. The old agreement contained no regulation as to the size of the openings in the mixers. This is remedied in this section by a definite provision as to the size of the openings in each mixer referred to by number or letter in the old ordinance.

This section 15 contains the only definite indication that anything in this ordinance was intended as a contractual proposition. This proposition for an agreement is limited to the matter covered by the old agreement. This leaves section 10 to stand as a regulating provision of legislative character, and not intended as a proposition under section 2479. The expression of a purpose to make an agreement, so far as there had been an agreement, and for the unexpired term of that agreement, is an indication of the limits of the agreement intended by the new ordinance. It is as much as to say that, "so far as there was an agreement, it shall be revived, subject to the provision herein as to the size of the openings in the mixers; but as to matters not within the old agreement there shall be no agree-

ment which is to stay our free hand as a legislative body." This is borne out by the fact that there is no limitation as to time contained in section 10, which provided a price when delivered through meters, or section 11, which refers to the use of gas by manufacturers. Why such particularity in limiting the agreement as to the delivery through mixers to the unexpired time of the old agreement, while neither of these sections contain any reference as to time? The only answer would be that the council intended to give to the new company all the privileges of the old, whose rights had been forfeited, and to make it an agreement just as broad as that it had had with the old company, but no broader.

To constitute a valid proposition for an agreement, the council should have made a schedule for a distinct period of time, not exceeding 10 years. Such a proposition, when accepted, would constitute an agreement. But if it be for an indefinite time, or for a period beyond the time allowed by section 2479, it will be void as an agreement. Coke Co. v. Avondale, 43 Ohio St. 257, 1 N. E. 527; State v. Gas Co., 37 Ohio St. 45.

The conclusion we reach is this: That section 10 is a legislative regulation of the price of gas delivered by meters, and a limitation upon the license granted this company, which must stand as a lawful regulation of price, under section 2478, Rev. St. Ohio, until altered, amended, or repealed by subsequent legislation. The receiver is as much bound by this public law as the company would be.

The decree is therefore affirmed.