MUNDORFF BEVERAGE COMPANY, a corporation of the State of Delaware,

*vs.*

THE SEVEN-UP WILMINGTON COMPANY, a corporation of the State of Delaware, and ANTHONY IMBESI.

*New Castle, Aug.* 16, 1940.

*Harold B. Howard,* of the firm of Hering, Morris, James & Hitchens, for complainant.

*Stewart Lynch,* for respondents.

THE VICE-CHANCELLOR: The main question is whether an agreement between complainant and the individual respondent, Imbesi, is valid and binding so as to confer upon complainant the right, enforceable by this court, to prevent respondents from selling or distributing a certain beverage within the City of Wilmington.

It is alleged in the bill that on March 30, 1936, "the complainant entered into an agreement with respondent Imbesi, whereby your complainant was extended an exclusive selling license for a trade-marked carbonated beverage known as '7-Up,' in a territory which consisted of the City of Wilmington, * * *" and "That the terms of said agreement were at said time reduced to writing." From the photostatic copy annexed to the bill the agreement appears to be written on business stationery of "Imbesi Bottling Works." It reads thus:

"For our mutual benefit and protection we hereby enter into an agreement that I will not bottle or enter into the sale of any Lithiated Lemon Drink, while I am distributor of 7Up.

"It is also agreed that I will maintain the suggested resale price of not less than .80¢ per case plus .50¢ per case bottle and box deposit for the 7 oz. bottles. And $1.20 per case plus .70¢ per case bottle and box deposit for 24 oz. bottles.

"Signatures:

"Anthony Imbesi

"Mundorff Beverage Co.

"H. C. Mundorff, Jr.

"P. S. We, the Philadelphia 7Up Bottling Co., agree to sell only the the [*sic*] Mundorff Beverage Co., Inc., in the City of Wilmington, Delaware, who will act as our local agent and cooperate with us in every possible way for our mutual profit and benefit."

The quoted language following the letters "P. S." purports to be on the part of the "Philadelphia 7-Up Bottling Co." which does not appear to be one of the signatories. Nevertheless, in view of the allegations, I shall assume for the present that this designation was adopted by, and means the respondent, Anthony Imbesi, whose signature does appear.

The bill shows that prior to the date of the agreement and at all times since, the individual respondent was licensed by The Howdy Company, a Missouri Corporation, to bottle and distribute the beverage "7-Up" in a territory including the State of Delaware; that The Howdy Company is "the owner of the registered trade mark 'Seven-Up' upon the records of the United States Patent Office, being Trade Mark No. 252,350"; that "The Howdy Company also controlled the secret formula for manufacture of a concentrate, which is the principal element in the compounding of said beverage, the other ingredient being carbonated water"; that Imbesi "personally and through the instrumentality of certain wholly owned subsidiary organizations and corporations * * * purchased the said concentrate from his licensor, added carbonated water * * * and distributed the bottled product to distributors and retailers throughout" his territory; that "it was the contemplation of the parties to the selling license" mentioned above "that your

complainant should buy said bottled product in case lots and exclusively sell the same to retailers in the City of Wilmington and its environs."

Complainant had been for many years engaged in the production of carbonated beverages, and in the distribution of such beverages, some of which were its own products, and some, the products of others. It had developed a "tremendous good will among its many customers which it still maintains" and "by reason of the exercise of its said prestige and good will" for the benefit of Imbesi, "complainant gave him the use of a valuable assets which resulted in the establishment of a constantly expanding demand" for the beverage "7-Up" in "Wilmington and its environs."

Upon entering into the alleged agreement, complainant purchased a large stock of "7-Up" and instructed its drivers to notify their customers that they were distributing it to the retail trade, and to make an effort to interest the retailers in the sale of "7-Up." The manager of complainant's "driver-salesmen" was sent out on several occasions to promote the sale of this drink. Complainant "used its entire business organization and its best efforts to build up and perpetuate a demand for the said beverage among its customers and other retailers throughout the said territory, such intensive promotion resulting in sales" of 2,635 cases during the last nine months of 1936. Complainant further sold 6,358 cases in 1937 and 5,453 cases up to September in 1938; and alleges that "it feels that said business would have continued to expand rapidly after said last mentioned date, since an established nucleus of demand had been created which was attracting customers from all sides."

At first, complainant obtained its supplies of the beverage from a bottling plant operated by Imbesi in Philadelphia. On August 1, 1938, Imbesi opened a new plant near Claymont, and instructed complainant to obtain supplies from it. Complainant did so. On August 15, 1938, Imbesi began to send trucks from the Claymont plant into the City

of Wilmington and its environs in an effort to sell "7-Up" directly to retailers throughout this territory. On September 14, following, complainant "sent a truck to said Claymont plant for supplies of '7-Up' together with payment therefor, but the officers in charge thereof, including the said respondent, Imbesi, refused to sell or deliver any supplies of said beverage to your complainant." Imbesi and "his subsidiary, respondent The Seven-Up Wilmington Company, have continued to refuse to sell supplies of said beverage to your complainant down to the present time, and have continued to distribute said beverage directly to retailers in the City of Wilmington and its environs in direct competition with, and without regard to the right of your complainant to exclusively distribute said beverage in said territory"; and notwithstanding that complainant has at all times complied with its obligations under the agreement.

On December 19, 1938, Imbesi caused to be incorporated the respondent, The Seven-Up Wilmington Company, and assigned to it the "facilities, business and operations" of the Claymont bottling plant. Since then the corporate respondent has operated this plant and has sent its agents to all of complainant's customers and notified them that complainant was no longer able to supply them with "7-Up" but that they would have to buy their supplies from the new corporation. The latter is completely under the domination of Imbesi, who is its president and owns or controls all of its capital stock. It is alleged that Imbesi, seeing that complainant was establishing a worth-while market for the beverage, deliberately set about in the summer of 1938 "to recapture said business" from complainant, and to distribute the beverage to complainant's customers in complete disregard of its rights, and to its great damage.

One of the grounds of demurrer assigned by each respondent is that "the alleged contract is vague and indefinite." Complainant takes the position that the agreement is a sales agency contract which is neither vague nor indefi-

nite, and proceeds to point out or explain those material elements which respondents say are lacking or uncertain.

The agreement does not expressly fix, nor furnish any means for fixing, the period of its duration, the quantity of beverage which Imbesi must deliver and complainant accept, or the price which complainant must pay at any time. Complainant urges that the time of termination of the agreement is February 5, 1949, the date of expiration of the trade-mark registration of "Seven-Up"; because "complainant is a sub-licensee under this contract of the right, protected by the trade mark, to sell '7-Up' exclusively within this territory"; and because "It is a well-recognized principle of the law of licenses that, when a right is granted to make, use, or sell any specific article protected by patent or trade mark, that license will be deemed to continue in effect until the protection ceases, in the absence of stipulation of a shorter period in the license agreement." The only authority cited is the case of *St. Paul Plow-Works v. Starling*, 140 *U. S.* 184, 195, 11 *S. Ct.* 803, 35 *L. Ed.* 404, which concerns a license under a patent. As to this contention, no more need be said, than that it is based on the false premise that the right to the exclusive use of a trade-mark is conferred by registration of the mark under the federal statutes. Such registration does not create any substantive rights in the registrant; it merely provides remedial and procedural benefits or advantages and authorizes triple damages for infringement. Whether or not the mark is registered, the right of the lawful owner or user of a valid trade-mark to appropriate relief in case of unauthorized use of it, has long been recognized by the common law and the chancery courts of England and of this country. *Trade-Mark Cases*, 100 *U. S.* 82, 25 *L. Ed.* 550; *American Trading Co. v. H. E. Heacock Co.*, 285 *U. S.* 247, 52 *S. Ct.* 387, 76 *L. Ed.* 740; *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 *U. S.* 315, 59 *S. Ct.* 191, 83 *L. Ed.* 195; 15 *U. S. C.*, § 103; *Nims on Unfair Competition and Trade-Marks*, (2d Ed.) §§ 222, 223.

Assuming that an exclusive right to use the mark "7-Up" now exists, it cannot be foretold when such right will cease. Hence, this provides no measure of the duration of the agreement in suit.

With respect to the quantity of beverage contemplated by the agreement, complainant says it was obviously the intention of the parties that complainant "should sell and Imbesi should supply all the beverage that could be marketed in the territory." Such a provision would be fraught with opportunities for differences of opinion and consequent difficulties in operation; and a court should be especially reluctant to compel performance of an undertaking of that character, unless the parties, by their own expressions, alone or in the light of extrinsic circumstances, signify unequivocally their intent so to be bound.

The agreement assumes to fix minimum prices at which complainant may resell the beverage, but prescribes no rule of calculation for determining the prices to be paid by complainant for the product. In this connection, complainant argues that "The prices specified for resale indicate that the prices to be paid by Mundorff were less, and the operation of the agreement for two years shows that no question ever arose as to this point." But if less, how much less? The fact that no difficulties concerning prices arose in the past does not establish what complainant must pay from now on, from day to day, from year to year.

Complainant also contends that the writing in question "does not necessarily contain the entire agreement of the parties" and that "Matters of quantity and price were subject to oral determination, and perhaps they were not incorporated in writing because of anticipation of future variation." Even if the agreement, in so many words, directed that the prices be left to "oral determination," this would not aid complainant, for it would indicate that "the parties have not contracted, but have only suggested the possibility of a future contract." *Raisler Sprinkler Co.*

*v. Automatic Sprinkler Co.,* 6 *W. W. Harr.* (36 *Del.*) 57, 74, 171 *A.* 214, 222.

The principles which control the case before me are summarized in *New York Johnson Motor Co. v. Johnson Motor Co.,* 15 *Del. Ch.* 356, 360, 138 *A.* 603, 605, as follows:

"The injustice of enjoining one party to a contract from its violation is too manifest for discussion when it is uncertain to what extent the obligations of the other party go in order for him to perform it. Inasmuch as the injunction is hoped to accomplish a specific performance by both sides to the contract, though its method is negative in operation, it ought never to issue in such cases if the contract is so indefinite as to leave in doubt what is necessary to satisfy performance by all of its parties."

What complainant asks is that this court supply essential terms which the parties failed to put into the agreement when it was written. "No matter how a contract may be regarded from an ethical standard, and however courts may strive to establish their enforceability, there is a limit at which they must stop." *Raisler Sprinkler Co. v. Automatic Sprinkler Co., supra.* The conclusion is that the agreement is too indefinite and leaves too many material subjects untouched to warrant relief in this court. *Jordan v. Buick Motor Co.,* (7 *Cir.*) 75 *F.* 2d 447, 450; *New York Johnson Co. v. Johnson Motor Co., supra; Restatement of the Laws of Contracts,* §§ 32, 370.

Other grounds of demurrer need not be considered.

An order sustaining the demurrers will be advised.