(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## B&B HARDWARE, INC. *v.* HARGIS INDUSTRIES, INC., DBA SEALTITE BUILDING FASTENERS ET AL., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 13–352. Argued December 2, 2014—Decided March 24, 2015

Respondent Hargis Industries, Inc. (Hargis), tried to register its trademark for SEALTITE with the United States Patent and Trademark Office pursuant to the Lanham Act. Petitioner, B&B Hardware, Inc. (B&B), however, opposed registration, claiming that SEALTITE is too similar to B&B's own SEALTIGHT trademark. The Trademark Trial and Appeal Board (TTAB) concluded that SEALTITE should not be registered because of the likelihood of confusion. Hargis did not seek judicial review of that decision.

Later, in an infringement suit before the District Court, B&B argued that Hargis was precluded from contesting the likelihood of confusion because of the TTAB's decision. The District Court disagreed. The Eighth Circuit affirmed, holding that preclusion was unwarranted because the TTAB and the court used different factors to evaluate likelihood of confusion, the TTAB placed too much emphasis on the appearance and sound of the two marks, and Hargis bore the burden of persuasion before the TTAB while B&B bore it before the District Court.

*Held*: So long as the other ordinary elements of issue preclusion are met, when the usages adjudicated by the TTAB are materially the same as those before a district court, issue preclusion should apply. Pp. 8–22.

(a) An agency decision can ground issue preclusion. The Court's cases establish that when Congress authorizes agencies to resolve disputes, "courts may take it as given that Congress has legislated with the expectation that [issue preclusion] will apply except when a statutory purpose to the contrary is evident." *Astoria Fed. Sav. & Loan Assn.* v. *Solimino*, 501 U. S. 104, 108. Constitutional avoidance

does not compel a different conclusion.  Pp. 8–12.

   (b) Neither the Lanham Act's text nor its structure rebuts the "presumption" in favor of giving preclusive effect to TTAB decisions where the ordinary elements of issue preclusion are met.  *Astoria,* 501 U. S., at 108.  This case is unlike *Astoria.*  There, where exhausting the administrative process was a prerequisite to suit in court, giving preclusive effect to the agency's determination in that very administrative process could have rendered the judicial suit "strictly *pro forma.*" *Id.,* at 111.  By contrast, registration involves a separate proceeding to decide separate rights.  Pp. 12–14.

   (c) There is no categorical reason why registration decisions can never meet the ordinary elements of issue preclusion.  That many registrations will not satisfy those ordinary elements does not mean that none will.  Pp. 15–22.

    (1) Contrary to the Eighth Circuit's conclusion, the same likelihood-of-confusion standard applies to both registration and infringement.  The factors that the TTAB and the Eighth Circuit use to assess likelihood of confusion are not fundamentally different, and, more important, the operative language of each statute is essentially the same.

   Hargis claims that the standards are different, noting that the registration provision asks whether the marks "resemble" each other, 15 U. S. C. §1052(d), while the infringement provision is directed towards the "use in commerce" of the marks, §1114(1).  That the TTAB and a district court do not always consider the *same usages,* however, does not mean that the TTAB applies a *different standard* to the usages it does consider.  If a mark owner uses its mark in materially the same ways as the usages included in its registration application, then the TTAB is deciding the same likelihood-of-confusion issue as a district court in infringement litigation.  For a similar reason, the Eighth Circuit erred in holding that issue preclusion could not apply because the TTAB relied too heavily on "appearance and sound." Pp. 15–19.

    (2) The fact that the TTAB and district courts use different procedures suggests only that sometimes issue preclusion might be inappropriate, not that it always is.  Here, there is no categorical "reason to doubt the quality, extensiveness, or fairness," *Montana v. United States,* 440 U. S. 147, 164, n. 11, of the agency's procedures.  In large part they are exactly the same as in federal court.  Also contrary to the Eighth Circuit's conclusion, B&B, the party opposing registration, not Hargis, bore the burden of persuasion before the TTAB, just as it did in the infringement suit.  Pp. 19–21.

    (3)  Hargis is also wrong that the stakes for registration are always too low for issue preclusion in later infringement litigation.

Syllabus

When registration is opposed, there is good reason to think that both sides will take the matter seriously. Congress' creation of an elaborate registration scheme, with many important rights attached and backed up by plenary review, confirms that registration decisions can be weighty enough to ground issue preclusion. Pp. 21–22.

716 F. 3d 1020, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. GINSBURG, J., filed a concurring opinion. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 13–352

———————

## B&B HARDWARE, INC., PETITIONER *v.* HARGIS INDUSTRIES, INC., DBA SEALTITE BUILDING FASTENERS, DBA EAST TEXAS FASTENERS ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[March 24, 2015]

JUSTICE ALITO delivered the opinion of the Court.

Sometimes two different tribunals are asked to decide the same issue. When that happens, the decision of the first tribunal usually must be followed by the second, at least if the issue is really the same. Allowing the same issue to be decided more than once wastes litigants' resources and adjudicators' time, and it encourages parties who lose before one tribunal to shop around for another. The doctrine of collateral estoppel or issue preclusion is designed to prevent this from occurring.

This case concerns the application of issue preclusion in the context of trademark law. Petitioner, B&B Hardware, Inc. (B&B), and respondent Hargis Industries, Inc. (Hargis), both use similar trademarks; B&B owns SEALTIGHT while Hargis owns SEALTITE. Under the Lanham Act, 60 Stat. 427, as amended, 15 U. S. C. §1051 *et seq.,* an applicant can seek to register a trademark through an administrative process within the United States Patent and Trademark Office (PTO). But if another party be-

lieves that the PTO should not register a mark because it is too similar to its own, that party can oppose registration before the Trademark Trial and Appeal Board (TTAB). Here, Hargis tried to register the mark SEALTITE, but B&B opposed SEALTITE's registration. After a lengthy proceeding, the TTAB agreed with B&B that SEALTITE should not be registered.

In addition to permitting a party to object to the registration of a mark, the Lanham Act allows a mark owner to sue for trademark infringement. Both a registration proceeding and a suit for trademark infringement, moreover, can occur at the same time. In this case, while the TTAB was deciding whether SEALTITE should be registered, B&B and Hargis were also litigating the SEALTIGHT versus SEALTITE dispute in federal court. In both registration proceedings and infringement litigation, the tribunal asks whether a likelihood of confusion exists between the mark sought to be protected (here, SEALTIGHT) and the other mark (SEALTITE).

The question before this Court is whether the District Court in this case should have applied issue preclusion to the TTAB's decision that SEALTITE is confusingly similar to SEALTIGHT. Here, the Eighth Circuit rejected issue preclusion for reasons that would make it difficult for the doctrine ever to apply in trademark disputes. We disagree with that narrow understanding of issue preclusion. Instead, consistent with principles of law that apply in innumerable contexts, we hold that a court should give preclusive effect to TTAB decisions if the ordinary elements of issue preclusion are met. We therefore reverse the judgment of the Eighth Circuit and remand for further proceedings.

## I

### A

Trademark law has a long history, going back at least to

Roman times. See Restatement (Third) of Unfair Competition §9, Comment *b* (1993). The principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others. *Ibid.* One who first uses a distinct mark in commerce thus acquires rights to that mark. See 2 J. McCarthy, Trademarks and Unfair Competition §16:1 (4th ed. 2014) (hereinafter McCarthy). Those rights include preventing others from using the mark. See 1 A. LaLonde, Gilson on Trademarks §3.02[8] (2014) (hereinafter Gilson).

Though federal law does not create trademarks, see, *e.g., Trade-Mark Cases*, 100 U. S. 82, 92 (1879), Congress has long played a role in protecting them. In 1946, Congress enacted the Lanham Act, the current federal trademark scheme. As relevant here, the Lanham Act creates at least two adjudicative mechanisms to help protect marks. First, a trademark owner can register its mark with the PTO. Second, a mark owner can bring a suit for infringement in federal court.

Registration is significant. The Lanham Act confers "important legal rights and benefits" on trademark owners who register their marks. 3 McCarthy §19:3, at 19–21 see also *id.,* §19:9, at 19–34 (listing seven of the "procedural and substantive legal advantages" of registration). Registration, for instance, serves as "constructive notice of the registrant's claim of ownership" of the mark. 15 U. S. C. §1072. It also is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." §1057(b). And once a mark has been registered for five years, it can become "incontestable." §§1065, 1115(b)

To obtain the benefits of registration, a mark owner files

an application with the PTO. §1051. The application must include, among other things, "the date of the applicant's first use of the mark, the date of the applicant's first use of the mark in commerce, the goods in connection with which the mark is used, and a drawing of the mark." §1051(a)(2). The usages listed in the application—*i.e.,* those goods on which the mark appears along with, if applicable, their channels of distribution—are critical. See, *e.g.,* 3 McCarthy §20:24, at 20–83 ("[T]he applicant's right to register must be made on the basis of the goods described in the application"); *id.,* §20:15, at 20–85 (explaining that if an "application does not delimit any specific trade channels of distribution, no limitation will be" applied). The PTO generally cannot register a mark which "so resembles" another mark "as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U. S. C. §1052(d).

If a trademark examiner believes that registration is warranted, the mark is published in the Official Gazette of the PTO. §1062. At that point, "[a]ny person who believes that he would be damaged by the registration" may "file an opposition." §1063(a). Opposition proceedings occur before the TTAB (or panels thereof). §1067(a). The TTAB consists of administrative trademark judges and high-ranking PTO officials, including the Director of the PTO and the Commissioner of Trademarks. §1067(b).

Opposition proceedings before the TTAB are in many ways "similar to a civil action in a federal district court." TTAB Manual of Procedure §102.03 (2014) (hereinafter TTAB Manual), online at http://www.uspto.gov (as visited Mar. 20, 2015, and available in Clerk of Court's case file). These proceedings, for instance, are largely governed by the Federal Rules of Civil Procedure and Evidence. See 37 CFR §§2.116(a), 2.122(a) (2014). The TTAB also allows discovery and depositions. See §§2.120, 2.123(a). The

party opposing registration bears the burden of proof, see §2.116(b), and if that burden cannot be met, the opposed mark must be registered, see 15 U. S. C. §1063(b).

The primary way in which TTAB proceedings differ from ordinary civil litigation is that "proceedings before the Board are conducted in writing, and the Board's actions in a particular case are based upon the written record therein." TTAB Manual §102.03. In other words, there is no live testimony. Even so, the TTAB allows parties to submit transcribed testimony, taken under oath and subject to cross-examination, and to request oral argument. See 37 CFR §§2.123, 2.129.

When a party opposes registration because it believes the mark proposed to be registered is too similar to its own, the TTAB evaluates likelihood of confusion by applying some or all of the 13 factors set out in *In re E. I. DuPont DeNemours & Co.*, 476 F. 2d 1357 (CCPA 1973). After the TTAB decides whether to register the mark, a party can seek review in the U. S. Court of Appeals for the Federal Circuit, or it can file a new action in district court. See 15 U. S. C. §1071. In district court, the parties can conduct additional discovery and the judge resolves registration *de novo*. §1071(b); see also 3 McCarthy §21:20 (explaining differences between the forums); cf. *Kappos* v. *Hyatt*, 566 U. S. ___ (2012) (*de novo* review for analogous scheme in patent law).

The Lanham Act, of course, also creates a federal cause of action for trademark infringement. The owner of a mark, whether registered or not, can bring suit in federal court if another is using a mark that too closely resembles the plaintiff's. The court must decide whether the defendant's use of a mark in commerce "is likely to cause confusion, or to cause mistake, or to deceive" with regards to the plaintiff's mark. See 15 U. S. C. §1114(1)(a) (registered marks); §1125(a)(1)(A) (unregistered marks). In infringement litigation, the district court considers the full

range of a mark's usages, not just those in the application.

B

Petitioner B&B and respondent Hargis both manufacture metal fasteners. B&B manufactures fasteners for the aerospace industry, while Hargis manufactures fasteners for use in the construction trade. Although there are obvious differences between space shuttles and A-frame buildings, both aerospace and construction engineers prefer fasteners that seal things tightly. Accordingly, both B&B and Hargis want their wares associated with tight seals. A feud of nearly two decades has sprung from this seemingly commonplace set of facts.

In 1993 B&B registered SEALTIGHT for "threaded or unthreaded metal fasteners and other related hardwar[e]; namely, self-sealing nuts, bolts, screws, rivets and washers, all having a captive o-ring, for use in the aerospace industry." App. 223a (capitalization omitted). In 1996, Hargis sought to register SEALTITE for "self-piercing and self-drilling metal screws for use in the manufacture of metal and post-frame buildings." App. 70a (capitalization omitted). B&B opposed Hargis' registration because, although the two companies sell different products, it believes that SEALTITE is confusingly similar to SEALTIGHT.

The twists and turns in the SEALTIGHT versus SEALTITE controversy are labyrinthine. The question whether either of these marks should be registered, and if so, which one, has bounced around within the PTO for about two decades; related infringement litigation has been before the Eighth Circuit three times; and two separate juries have been empaneled and returned verdicts. The full story could fill a long, unhappy book.

For purposes here, we pick up the story in 2002, when the PTO published SEALTITE in the Official Gazette. This prompted opposition proceedings before the TTAB,

complete with discovery, including depositions. B&B argued that SEALTITE could not be registered because it is confusingly similar to SEALTIGHT. B&B explained, for instance, that both companies have an online presence, the largest distributor of fasteners sells both companies' products, and consumers sometimes call the wrong company to place orders. Hargis rejoined that the companies sell different products, for different uses, to different types of consumers, through different channels of trade.

Invoking a number of the *DuPont* factors, the TTAB sided with B&B. The Board considered, for instance, whether SEALTIGHT is famous (it's not, said the Board), how the two products are used (differently), how much the marks resemble each other (very much), and whether customers are actually confused (perhaps sometimes). See App. to Pet. for Cert. 55a–71a. Concluding that "the most critical factors in [its] likelihood of confusion analysis are the similarities of the marks and the similarity of the goods," *id.,* at 70a, the TTAB determined that SEALTITE—when "used in connection with 'self-piercing and self-drilling metal screws for use in the manufacture of metal and post-frame buildings'"—could not be registered because it "so resembles" SEALTIGHT when "used in connection with fasteners that provide leakproof protection from liquids and gases, fasteners that have a captive o-ring, and 'threaded or unthreaded metal fastners and other related hardware . . . for use in the aerospace industry' as to be likely to cause confusion," *id.,* at 71a. Despite a right to do so, Hargis did not seek judicial review in either the Federal Circuit or District Court.

All the while, B&B had sued Hargis for infringement. Before the District Court ruled on likelihood of confusion, however, the TTAB announced its decision. After a series of proceedings not relevant here, B&B argued to the District Court that Hargis could not contest likelihood of confusion because of the preclusive effect of the TTAB

decision. The District Court disagreed, reasoning that the TTAB is not an Article III court. The jury returned a verdict for Hargis, finding no likelihood of confusion.

B&B appealed to the Eighth Circuit. Though accepting for the sake of argument that agency decisions can ground issue preclusion, the panel majority affirmed for three reasons: first, because the TTAB uses different factors than the Eighth Circuit to evaluate likelihood of confusion; second, because the TTAB placed too much emphasis on the appearance and sound of the two marks; and third, because Hargis bore the burden of persuasion before the TTAB, while B&B bore it before the District Court. 716 F. 3d 1020 (2013). Judge Colloton dissented, concluding that issue preclusion should apply. After calling for the views of the Solicitor General, we granted certiorari. 573 U. S. ___ (2014).

## II

The first question that we must address is whether an agency decision can ever ground issue preclusion. The District Court rejected issue preclusion because agencies are not Article III courts. The Eighth Circuit did not adopt that view, and, given this Court's cases, it was right to take that course.

This Court has long recognized that "the determination of a question directly involved in one action is conclusive as to that question in a second suit." *Cromwell* v. *County of Sac*, 94 U. S. 351, 354 (1877). The idea is straightforward: Once a court has decided an issue, it is "forever settled as between the parties," *Baldwin* v. *Iowa State Traveling Men's Assn.* 283 U. S. 522, 525 (1931), thereby "protect[ing]" against "the expense and vexation attending multiple lawsuits, conserv[ing] judicial resources, and foster[ing] reliance on judicial action by minimizing the possibility of inconsistent verdicts," *Montana* v. *United States*, 440 U. S. 147, 153–154 (1979). In short, "a losing

litigant deserves no rematch after a defeat fairly suffered." *Astoria Fed. Sav. & Loan Assn.* v. *Solimino*, 501 U. S. 104, 107 (1991).

Although the idea of issue preclusion is straightforward, it can be challenging to implement. The Court, therefore, regularly turns to the Restatement (Second) of Judgments for a statement of the ordinary elements of issue preclusion. See, *e.g., Bobby* v. *Bies*, 556 U. S. 825, 834 (2009); *New Hampshire* v. *Maine*, 532 U. S. 742, 748–749 (2001); *Baker* v. *General Motors Corp.*, 522 U. S. 222, 233, n. 5 (1998). The Restatement explains that subject to certain well-known exceptions, the general rule is that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments §27, p. 250 (1980); see also *id.,* §28, at 273 (listing exceptions such as whether appellate review was available or whether there were "differences in the quality or extensiveness of the procedures followed").

Both this Court's cases and the Restatement make clear that issue preclusion is not limited to those situations in which the same issue is before two *courts.* Rather, where a single issue is before a court and an administrative agency, preclusion also often applies. Indeed, this Court has explained that because the principle of issue preclusion was so "well established" at common law, in those situations in which Congress has authorized agencies to resolve disputes, "courts may take it as given that Congress has legislated with the expectation that the principle [of issue preclusion] will apply except when a statutory purpose to the contrary is evident." *Astoria, supra,* at 108. This reflects the Court's longstanding view that "'[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it

which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose.'" *University of Tenn.* v. *Elliott*, 478 U. S. 788, 797–798 (1986) (quoting *United States* v. *Utah Constr. & Mining Co.*, 384 U. S. 394, 422 (1966)); see also *Hayfield Northern R. Co.* v. *Chicago & North Western Transp. Co.*, 467 U. S. 622, 636, n. 15 (1984) (noting *Utah Construction*); *Kremer* v. *Chemical Constr. Corp.*, 456 U. S. 461, 484–485, n. 26 (1982) (characterizing *Utah Construction*'s discussion of administrative preclusion as a holding); Restatement (Second) of Judgments §83(1), at 266 (explaining that, with some limits, "a valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court").

Although apparently accepting *Astoria* and *Utah Construction*,[1] Hargis argues that we should not read the Lanham Act (or, presumably, many other federal statutes) as authorizing issue preclusion. Otherwise, Hargis warns, the Court would have to confront "'grave and doubtful questions' as to the Lanham Act's consistency with the Seventh Amendment and Article III of the Constitution." Brief for Respondent 38 (quoting *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U. S. 366, 408 (1909)). We are not persuaded.

At the outset, we note that Hargis does not argue that giving issue preclusive effect to the TTAB's decision would be unconstitutional. Instead, Hargis contends only that

---

[1] See Brief for Respondent 28 (acknowledging that administrative "[p]reclusion's status as part of the common-law backdrop means that courts may presume its application" absent contrary indication from Congress) (citing *Astoria* 501 U. S., at 110); Brief for Respondent 34 (explaining that *Utah Construction* determined that "an administrative board's factfinding . . . could . . . have preclusive effect in an Article III suit raising damages claims over which the board had no jurisdiction").

we should read the Lanham Act narrowly because a broad reading *might* be unconstitutional. See, *e.g.,* Brief for Respondent 37, 39, 40, 41–42. The likely reason that Hargis has not directly advanced a constitutional argument is that, at least as to a jury trial right, Hargis did not even list the Seventh Amendment as an authority in its appellee brief to the Eighth Circuit. Moreover, although Hargis pressed an Article III argument below, in its opposition to certiorari in this Court, Hargis seemingly conceded that TTAB decisions *can sometimes* ground issue preclusion, though it now protests otherwise. See Supplemental Brief in Opposition 2. To the extent, if any, that there could be a meritorious constitutional objection, it is not before us. See *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 231–232 (1995).

We reject Hargis' statutory argument that we should jettison administrative preclusion in whole or in part to avoid potential constitutional concerns. As to the Seventh Amendment, for instance, the Court has already held that the right to a jury trial does not negate the issue-preclusive effect of a judgment, even if that judgment was entered by a juryless tribunal. See *Parklane Hosiery Co.* v. *Shore*, 439 U. S. 322, 337 (1979). It would seem to follow naturally that although the Seventh Amendment creates a jury trial right in suits for trademark damages, see *Dairy Queen, Inc.* v. *Wood*, 369 U. S. 469, 477, 479–480 (1962), TTAB decisions still can have preclusive effect in such suits. Hargis disputes this reasoning even though it admits that in 1791 "'a party was not entitled to have a jury determine issues that had been previously adjudicated by a chancellor in equity.'" Brief for Respondent 39 (quoting *Parklane Hosiery*, *supra*, at 333). Instead, Hargis contends that issue preclusion should not apply to TTAB registration decisions because there were no agencies at common law. But our precedent holds that the Seventh Amendment does not strip competent tribunals of the

power to issue judgments with preclusive effect; that logic would not seem to turn on the nature of the competent tribunal. And at the same time, adopting Hargis' view would dramatically undercut agency preclusion, despite what the Court has already said to the contrary. Nothing in Hargis' avoidance argument is weighty enough to overcome these weaknesses.

The claim that we should read the Lanham Act narrowly to avoid Article III concerns is equally unavailing—and for similar reasons. Hargis argues that because it might violate Article III if an agency could make a decision with preclusive effect in a later proceeding before a federal court, we should conclude, as a statutory matter, that issue preclusion is unavailable. Such a holding would not fit with our precedent. For instance, in *Elliott*, the Court, relying on *Utah Construction,* explained that absent a contrary indication, Congress presumptively intends that an agency's determination (there, a state agency) has preclusive effect. 478 U. S., at 796–799; see also *Astoria*, 501 U. S., at 110 (recognizing the "presumption"). To be sure, the Court has never addressed whether such preclusion offends Article III. But because this Court's cases are so clear, there is no ambiguity for this Court to sidestep through constitutional avoidance.[2]

## III

The next question is whether there is an "evident" reason why Congress would not want TTAB decisions to

──────────

[2] Our dissenting colleagues argue that *Utah Construction*'s conclusion that courts "have not hesitated" to apply administrative preclusion, 384 U. S., at 422, was mistaken and certainly should not be applied to statutes—such as the Lanham Act—enacted prior to 1966. We do not decide who reads the history better. The Court has repeatedly endorsed *Utah Construction* and, importantly, neither party challenges its historical accuracy. For the same reason, we do not decide whether such preclusion is unconstitutional because the issue is not before us.

receive preclusive effect, even in those cases in which the ordinary elements of issue preclusion are met. *Astoria*, *supra,* at 108. We conclude that nothing in the Lanham Act bars the application of issue preclusion in such cases.

The Lanham Act's text certainly does not forbid issue preclusion. Nor does the Act's structure. Granted, one can seek judicial review of a TTAB registration decision in a *de novo* district court action, and some courts have concluded from this that Congress does not want unreviewed TTAB decisions to ground issue preclusion. See, *e.g., American Heritage Life Ins. Co.* v. *Heritage Life Ins. Co.,* 494 F. 2d 3, 9–10 (CA5 1974). But that conclusion does not follow. Ordinary preclusion law teaches that if a party to a court proceeding does not challenge an adverse decision, that decision can have preclusive effect in other cases, even if it would have been reviewed *de novo*. See Restatement (Second) of Judgments §28, Comment *a* and Illustration 1 (explaining that the failure to pursue an appeal does not undermine issue preclusion and including an example of an apparently unappealed district court's dismissal for failure to state a claim); cf. *Federated Department Stores, Inc.* v. *Moitie*, 452 U. S. 394, 398 (1981) (noting "the res judicata consequences of a final, unappealed judgment on the merits").

This case is also unlike *Astoria*, where a plaintiff claiming discrimination first went to an agency and then sued in court about the same alleged conduct. See 501 U. S., at 111. The Court concluded, quite sensibly, that the structure of that scheme indicated that the agency decision could not ground issue preclusion. When exhausting an administrative process is a prerequisite to suit in court, giving preclusive effect to the agency's determination in that very administrative process could render the judicial suit "strictly *pro forma*." *Ibid.*; see also *Elliott*, *supra*, at 795–796 (similar analysis). Here, if a party urged a district court reviewing a TTAB registration decision to give

preclusive effect to the very TTAB decision under review, *Astoria* would apply. But that is not this case.

What matters here is that registration is not a prerequisite to an infringement action. Rather, it is a separate proceeding to decide separate rights. Neither is issue preclusion a one-way street. When a district court, as part of its judgment, decides an issue that overlaps with part of the TTAB's analysis, the TTAB gives preclusive effect to the court's judgment. See App. to Pet. for Cert. 54a–55a (giving preclusive effect to the District Court's earlier decision regarding SEALTIGHT's distinctiveness because the issue "was actually litigated and necessarily determined").

Hargis also argues that allowing TTAB decisions to have issue-preclusive effect will adversely affect the registration process. Because of the TTAB's "'limited jurisdiction'" and "'the narrowness of the issues'" before it, Hargis contends, the Court should infer that TTAB proceedings are supposed to be more streamlined than infringement litigation. See Brief for Respondent 30 (quoting TTAB Manual §402.01). But, the argument goes, if TTAB decisions can have issue-preclusive effect in infringement litigation, parties may spend more time and energy before the TTAB, thus bogging down the registration process. This concern does not change our conclusion. Issue preclusion is available unless it is "evident," *Astoria, supra*, at 108, that Congress does not want it. Here, if a streamlined process in all registration matters was particularly dear to Congress, it would not have authorized *de novo* challenges for those "dissatisfied" with TTAB decisions. 15 U. S. C. §1071(b). Plenary review serves many functions, but ensuring a streamlined process is not one of them. Moreover, as explained below, for a great many registration decisions issue preclusion obviously will not apply because the ordinary elements will not be met. For those registrations, nothing we say today is relevant.

## IV

At last we turn to whether there is a categorical reason why registration decisions can never meet the ordinary elements of issue preclusion, *e.g.,* those elements set out in §27 of the Restatement (Second) of Judgments. Although many registrations will not satisfy those ordinary elements, that does not mean that none will. We agree with Professor McCarthy that issue preclusion applies where "the issues in the two cases are indeed identical and the other rules of collateral estoppel are carefully observed." 6 McCarthy §32:99, at 32–244; see also 3 Gilson §11.08[4][i][iii][B], p. 11–319 ("Ultimately, Board decisions on likelihood of confusion . . . should be given preclusive effect on a case-by-case basis").

### A

The Eighth Circuit's primary objection to issue preclusion was that the TTAB considers different factors than it does. Whereas the TTAB employs some or all of the *DuPont* factors to assess likelihood of confusion, the Eighth Circuit looks to similar, but not identical, factors identified in *SquirtCo* v. *Seven-Up Co.*, 628 F. 2d 1086, 1091 (CA8 1980). The court's instinct was sound: "[I]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits may be the same." 18 C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure §4417, p. 449 (2d ed. 2002) (hereinafter Wright & Miller). Here, however, the same likelihood-of-confusion standard applies to both registration and infringement.

To begin with, it does not matter that registration and infringement are governed by different statutory provisions. Often a single standard is placed in different statutes; that does not foreclose issue preclusion. See, *e.g., Smith* v. *Bayer Corp.*, 564 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 7). Neither does it matter that the TTAB and the Eighth

Circuit use different factors to assess likelihood of confusion. For one thing, the factors are not fundamentally different, and "[m]inor variations in the application of what is in essence the same legal standard do not defeat preclusion." *Id.,* at ___, n. 9 (slip op., at 12, n. 9). More important, if federal law provides a single standard, parties cannot escape preclusion simply by litigating anew in tribunals that apply that one standard differently. A contrary rule would encourage the very evils that issue preclusion helps to prevent.

The real question, therefore, is whether likelihood of confusion for purposes of registration is the same standard as likelihood of confusion for purposes of infringement. We conclude it is, for at least three reasons. First, the operative language is essentially the same; the fact that the registration provision separates "likely" from "to cause confusion, or to cause mistake, or to deceive" does not change that reality.[3] See 2 Gilson §5.01[2][a], at 5–17 (explaining that "the same statutory test" applies). Second, the likelihood-of-confusion language that Congress used in these Lanham Act provisions has been central to trademark registration since at least 1881. See Act of Mar. 3, 1881, ch. 138, §3, 21 Stat. 503 (using a "likely to cause confusion" standard for registration). That could hardly have been by accident. And third, district courts can cancel registrations during infringement litigation,

---

[3] Compare 15 U. S. C. §1114(1) ("Any person who shall . . . use in commerce any . . . mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is *likely to cause confusion, or to cause mistake, or to deceive* . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided" (emphasis added)) with §1052(d) ("No trademark . . . shall be refused registration . . . unless it . . . [c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office . . . as to be *likely*, when used on or in connection with the goods of the applicant, *to cause confusion, or to cause mistake, or to deceive* . . ." (emphasis added)).

just as they can adjudicate infringement in suits seeking judicial review of registration decisions. See 15 U. S. C. §1119; 3 McCarthy §21:20. There is no reason to think that the same district judge in the same case should apply two separate standards of likelihood of confusion.

Hargis responds that the text is not actually the same because the registration provision asks whether the marks "resemble" each other, 15 U. S. C. §1052(d), while the infringement provision is directed towards the "use in commerce" of the marks, §1114(1). Indeed, according to Hargis, the distinction between "resembl[ance]" and "use" has been key to trademark law for over a century. There is some force to this argument. It is true that "a party opposing an application to register a mark before the Board often relies only on its federal registration, not on any common-law rights in usages not encompassed by its registration," and "the Board typically analyzes the marks, goods, and channels of trade only as set forth in the application and in the opposer's registration, regardless of whether the actual usage of the marks by either party differs." Brief for United States as *Amicus Curiae* 23; see also *id.,* at 5 (explaining that "the Board typically reviews only the usages encompassed by the registration") (citing 3 Gilson §9.03[2][a][ii]); 3 McCarthy §20:15, at 20–45 (explaining that for registration "it is the mark as shown in the application and as used on the goods described in the application which must be considered, not the mark as actually used"). This means that unlike in infringement litigation, "[t]he Board's determination that a likelihood of confusion does or does not exist will not resolve the confusion issue with respect to non-disclosed usages." Brief for United States as *Amicus Curiae* 23.

Hargis' argument falls short, however, because it mistakes a reason not to apply issue preclusion in some or even many cases as a reason never to apply issue preclusion. Just because the TTAB does not always consider the

*same usages* as a district court does, it does not follow that the Board applies a *different standard* to the usages it does consider.[4]  If a mark owner uses its mark in ways that are materially the same as the usages included in its registration application, then the TTAB is deciding the same likelihood-of-confusion issue as a district court in infringement litigation.  By contrast, if a mark owner uses its mark in ways that are materially unlike the usages in its application, then the TTAB is not deciding the same issue.  Thus, if the TTAB does not consider the market-place usage of the parties' marks, the TTAB's decision should "have no later preclusive effect in a suit where actual usage in the marketplace is the paramount issue." 6 McCarthy §32:101, at 32–246.

Materiality, of course, is essential—trivial variations between the usages set out in an application and the use of a mark in the marketplace do not create different "issues," just as trivial variations do not create different "marks."  See generally 4 *id.*, §23:50, at 23–265 (explaining that "adding descriptive or non-distinctive" elements to another's mark generally will not negate confusion). Otherwise, a party could escape the preclusive effect of an adverse judgment simply by adding an immaterial feature to its mark.  That is not the law.  See, *e.g.,* Restatement (Second) of Judgments §27, Comment *c*, at 252–253 (explaining that "issue" must be understood broadly enough "to prevent repetitious litigation of what is essentially the same dispute"); *United States* v. *Stauffer Chemical Co.*, 464 U. S. 165, 172 (1984) (applying issue preclusion where a party sought to "litigate twice . . . an issue arising . . . from virtually identical facts" because the "factual differ-

––––––––––

[4] The parties dispute whether and how often the TTAB considers usages beyond those listed in the application and registration.  We do not resolve that dispute here.  Suffice it to say that when the TTAB adjudicates a usage *within its authority*, that adjudication can ground issue preclusion.  See Restatement (Second) of Judgments §11 (1980).

ences" were "of no legal significance").

*A fortiori*, if the TTAB considers a different mark alto-gether, issue preclusion would not apply. Needless to say, moreover, if the TTAB has not decided the same issue as that before the district court, there is no reason why any deference would be warranted.

For a similar reason, the Eighth Circuit erred in holding that issue preclusion could not apply here because the TTAB relied too heavily on "appearance and sound." App. to Pet. for Cert. 10a. Undoubtedly there are cases in which the TTAB places more weight on certain factors than it should. When that happens, an aggrieved party should seek judicial review. The fact that the TTAB may have erred, however, does not prevent preclusion. As Judge Colloton observed in dissent, "'issue preclusion prevent[s] relitigation of wrong decisions just as much as right ones.'" 716 F. 3d, at 1029 (quoting *Clark* v. *Clark*, 984 F. 2d 272, 273 (CA8 1993)); see also Restatement (Second) of Judgments §28, Comment *j*, at 284 (explaining that "refusal to give the first judgment preclusive effect should not . . . be based simply on a conclusion that [it] was patently erroneous").

B

Hargis also argues that registration is categorically incompatible with issue preclusion because the TTAB uses procedures that differ from those used by district courts. Granted, "[r]edetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana*, 440 U. S., at 164, n. 11; see also *Parklane Hosiery*, 439 U. S., at 331, and n. 15 (similar). But again, this only suggests that sometimes issue preclusion might be inappropriate, not that it always is.

No one disputes that the TTAB and district courts use different procedures. Most notably, district courts feature

live witnesses. Procedural differences, by themselves, however, do not defeat issue preclusion. Equity courts used different procedures than did law courts, but that did not bar issue preclusion. See *id.,* at 333. Nor is there reason to think that the state agency in *Elliott* used procedures identical to those in federal court; nonetheless, the Court held that preclusion could apply. See 478 U. S., at 796–799. Rather than focusing on whether procedural differences exist—they often will—the correct inquiry is whether the procedures used in the first proceeding were fundamentally poor, cursory, or unfair. See *Montana,* 440 U. S., at 164, n. 11.

Here, there is no categorical "reason to doubt the quality, extensiveness, or fairness," *ibid.,* of the agency's procedures. In large part they are exactly the same as in federal court. See 37 CFR §§2.116(a), 2.122(a). For instance, although the "[t]he scope of discovery in Board proceedings . . . . is generally narrower than in court proceedings"— reflecting the fact that there are often fewer usages at issue—the TTAB has adopted almost the whole of Federal Rule of Civil Procedure 26. TTAB Manual §402.01; see also *id.,* §401. It is conceivable, of course, that the TTAB's procedures may prove ill-suited for a particular issue in a particular case, *e.g.,* a party may have tried to introduce material evidence but was prevented by the TTAB from doing so, or the TTAB's bar on live testimony may materially prejudice a party's ability to present its case. The ordinary law of issue preclusion, however, already accounts for those "rare" cases where a "compelling showing of unfairness" can be made. Restatement (Second) of Judgments §28, Comments *g* and *j*, at 283–284.

The Eighth Circuit likewise erred by concluding that Hargis bore the burden of persuasion before the TTAB. B&B, the party opposing registration, bore the burden, see 37 CFR §2.116(b); TTAB Manual §702.04(a), just as it did in the infringement action. Hargis does not defend the

decision below on this ground.

C

Hargis also contends that the stakes for registration are so much lower than for infringement that issue preclusion should never apply to TTAB decisions. Issue preclusion may be inapt if "the amount in controversy in the first action [was] so small in relation to the amount in controversy in the second that preclusion would be plainly unfair." Restatement (Second) of Judgments §28, Comment *j*, at 283–284. After all, "[f]ew . . . litigants would spend $50,000 to defend a $5,000 claim." Wright & Miller §4423, at 612. Hargis is wrong, however, that this exception to issue preclusion applies to every registration. To the contrary: When registration is opposed, there is good reason to think that both sides will take the matter seriously.

The benefits of registration are substantial. Registration is "prima facie evidence of the validity of the registered mark," 15 U. S. C. §1057(b), and is a precondition for a mark to become "incontestable," §1065. Incontestability is a powerful protection. See, *e.g., Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.*, 469 U. S. 189, 194 (1985) (holding that an incontestable mark cannot be challenged as merely descriptive); see also *id.,* at 193 (explaining that "Congress determined that . . . 'trademarks should receive nationally the greatest protection that can be given them'" and that "[a]mong the new protections created by the Lanham Act were the statutory provisions that allow a federally registered mark to become incontestable" (quoting S. Rep. No. 1333, 79th Cong., 2d Sess., 6 (1946))).

The importance of registration is undoubtedly why Congress provided for *de novo* review of TTAB decisions in district court. It is incredible to think that a district court's adjudication of particular usages would not have preclusive effect in another district court. Why would

unchallenged TTAB decisions be different?  Congress' creation of this elaborate registration scheme, with so many important rights attached and backed up by plenary review, confirms that registration decisions can be weighty enough to ground issue preclusion.

## V

For these reasons, the Eighth Circuit erred in this case. On remand, the court should apply the following rule:  So long as the other ordinary elements of issue preclusion are met, when the usages adjudicated by the TTAB are materially the same as those before the district court, issue preclusion should apply.

The judgment of the United States Court of Appeals for the Eighth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–352

_____

B & B HARDWARE, INC., PETITIONER *v.* HARGIS
INDUSTRIES, INC., DBA SEALTITE BUILDING
FASTENERS, DBA EAST TEXAS
FASTENERS ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[March 24, 2015]

JUSTICE GINSBURG, concurring.

The Court rightly recognizes that "for a great many
registration decisions issue preclusion obviously will not
apply." *Ante,* at 14–15. That is so because contested
registrations are often decided upon "a comparison of the
marks in the abstract and apart from their marketplace
usage." 6 J. McCarthy, Trademarks and Unfair Competi-
tion §32:101, p. 32–247 (4th ed. 2014). When the registra-
tion proceeding is of that character, "there will be no
[preclusion] of the likel[ihood] of confusion issue . . . in a
later infringement suit." *Ibid.* On that understanding, I
join the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–352

_____

## B&B HARDWARE, INC., PETITIONER *v.* HARGIS INDUSTRIES, INC., DBA SEALTITE BUILDING FASTENERS, DBA EAST TEXAS FASTENERS ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[March 24, 2015]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

The Court today applies a presumption that when Congress enacts statutes authorizing administrative agencies to resolve disputes in an adjudicatory setting, it intends those agency decisions to have preclusive effect in Article III courts. That presumption was first announced in poorly supported dictum in a 1991 decision of this Court, and we have not applied it since. Whatever the validity of that presumption with respect to statutes enacted after its creation, there is no justification for applying it to the Lanham Act, passed in 1946. Seeing no other reason to conclude that Congress implicitly authorized the decisions of the Trademark Trial and Appeal Board (TTAB) to have preclusive effect in a subsequent trademark infringement suit, I would affirm the decision of the Court of Appeals.

I

A

The presumption in favor of administrative preclusion the Court applies today was first announced in *Astoria Fed. Sav. & Loan Assn.* v. *Solimino*, 501 U. S. 104, 108 (1991). In that case, the Court confronted the question

"whether claimants under the Age Discrimination in Employment Act of 1967 [(ADEA)] . . . are collaterally estopped to relitigate in federal court the judicially unreviewed findings of a state administrative agency made with respect to an age-discrimination claim." *Id.,* at 106. It answered that question in the negative, concluding that the availability of administrative preclusion was an issue of statutory construction and that the particular statute at issue "carrie[d] an implication that the federal courts should recognize no [such] preclusion." *Id.,* at 108, 110.

Despite rejecting the availability of preclusion, the Court nevertheless, in dictum, announced a presumption in favor of giving preclusive effect to administrative determinations "where Congress has failed expressly or impliedly to evince any intention on the issue." *Id.,* at 110. That dictum rested on two premises. First, that "Congress is understood to legislate against a background of common-law adjudicatory principles." *Id.,* at 108. And, second, that the Court had "long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality." *Id.,* at 107.

I do not quarrel with the first premise, but I have serious doubts about the second. The Court in *Astoria* offered only one decision predating the enactment of the ADEA to shore up its assertion that Congress had legislated against a background principle in favor of administrative preclusion—*United States* v. *Utah Constr. & Mining Co.*, 384 U. S. 394, 422 (1966). See *Astoria, supra,* at 107.[1] And that decision cannot be read for the broad proposition

---

[1] The Court also cited *University of Tenn.* v. *Elliott*, 478 U. S. 788, 798 (1986), but because that decision postdated the enactment of the ADEA by almost two decades and itself primarily relied on *Utah Construction* it cannot be evidence of any background principle existing at the relevant time.

asserted by the Court.

Like *Astoria* itself, *Utah Construction* discussed administrative preclusion only in dictum. The case arose out of a contract dispute between the United States and a private contractor. 384 U. S., at 400. The contract at issue contained a disputes clause providing for an administrative process by which "'disputes concerning questions of fact arising under th[e] contract'" would be decided by the contracting officer, subject to written appeal to the head of the department. *Id.,* at 397–398. The Wunderlich Act of 1954 likewise provided that such administrative factfinding would be "final and conclusive" in a later breach-of-contract action "'unless the same is fra[u]dulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.'" *Id.,* at 399. Because both "the disputes clause [of the contract] and the Wunderlich Act categorically state[d] that administrative findings on factual issues relevant to questions arising under the contract [would] be final and conclusive on the parties," the Court required the lower courts to accept those findings. *Id.,* at 419. Only after acknowledging that its decision "rest[ed] upon the agreement of the parties as modified by the Wunderlich Act" did the Court go on to comment that the decision was "harmonious with general principles of collateral estoppel." *Id.,* at 421.

To create a presumption based solely on dictum would be bad enough, but the principles *Utah Construction* referred to were far too equivocal to constitute "long-established and familiar" background principles of the common law of the sort on which we base our statutory inferences. *Isbrandtsen Co.* v. *Johnson*, 343 U. S. 779, 783 (1952). Although *Utah Construction* asserted that "[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to

litigate, the courts have not hesitated to apply *res judicata* to enforce repose," it admitted that "courts have used language to the effect that *res judicata* principles do not apply to administrative proceedings." 384 U. S.*,* at 421–422. These contradictory signals are not typically the stuff of which background rules of common law are made. Cf. *Kirtsaeng* v. *John Wiley & Sons, Inc.*, 568 U. S. ___, ___ (2013) (slip op., at 17) (presuming that Congress intended to retain the "first sale" doctrine in copyright statutes based on that common-law doctrine's "impeccable historic pedigree").

B

If the occasion had arisen in *Astoria* for the Court to examine the history of administrative preclusion, it would have discovered that the issue was far from settled.

At common law, principles of res judicata and collateral estoppel applied only to a decision by a "court of competent jurisdiction." *Aurora City* v. *West*, 7 Wall. 82, 102 (1869); accord, *Hopkins* v. *Lee*, 6 Wheat. 109, 113 (1821); Restatement of Judgments §§4, 7, and Comment *f*, pp. 20, 41, 45 (1942). That rule came with the corollary requirement that the court be "legally constituted"—that is, a court "known to and recognized by the law." 2 H. Black, Law of Judgments §516, p. 614 (1891). A court not "legally constituted" lacked jurisdiction to enter a legally binding judgment, and thus any such judgment could have no preclusive effect. *Ibid.*

Nineteenth century courts generally understood the term "court of competent jurisdiction" to include all courts with authority and jurisdiction conclusively to resolve a dispute. See J. Wells, A Treatise on the Doctrines of Res Judicata and Stare Decisis §§422–423, pp. 336–338 (1878); 2 Black, *supra*, §516, at 613–614. Thus, courts of law, courts of equity, admiralty courts, and foreign courts could all satisfy the requirement of a "[c]ourt of competent juris-

diction." *Hopkins*, 6 Wheat.*,* at 113.  This broad definition served the interest in finality that supports preclusion doctrines, without which "an end could never be put to litigation." *Id.,* at 114.

But however broadly "[c]ourt of competent jurisdiction" was defined, it would require quite a leap to say that the concept encompasses administrative agencies, which were recognized as categorically different from courts.  *E.g., Pearson* v. *Williams*, 202 U. S. 281 (1906); F. Cooper, Administrative Agencies and the Courts 241–242 (1951) (taking the position that agencies "are not courts, and their determinations are not judgments").  This distinction stems from the Constitution itself, which vests the "judicial Power" not in administrative agencies, but in federal courts, whose independence is safeguarded by certain constitutional requirements.  Art. III, §1.  One of the consequences of this allocation of judicial power is that agencies possess limited ability to act in a judicial capacity in cases resolving traditional disputes between private parties.  See *infra*, at 11–12.

It is therefore unsurprising that federal courts—including this Court—have been far more hesitant than today's majority to extend common-law preclusion principles to decisions of administrative tribunals.  In *Pearson*, for example, this Court declined to recognize any preclusive effect of a decision of an immigration board.  202 U. S., at 284–285.  Writing for the Court, Justice Holmes explained that "[t]he board is an instrument of the executive power, not a court"; that it consisted of officials "whose duties are declared to be administrative by" statute; and that "[d]ecisions of a similar type long have been recognized as decisions of the executive department, and cannot constitute *res judicata* in a technical sense." *Ibid.*

Other courts likewise declined to apply general preclusion principles to decisions of administrative agencies. For example, as late as 1947, the D. C. Circuit would rely

on the "well settled doctrine that *res judicata* and equitable estoppel do not ordinarily apply to decisions of administrative tribunals." *Churchill Tabernacle* v. *FCC*, 160 F. 2d 244, 246 (1947).

The Restatement of Judgments also reflected this practice: It contained no provision for administrative preclusion and explained that it would not address "the effect of the decisions of administrative tribunals." Restatement of Judgments, Scope Note, at 2. It rejected the idea of any consistent practice in favor of administrative preclusion, noting that "the question whether the decisions of a particular tribunal are binding in subsequent controversies depends upon the character of the tribunal and the nature of its procedure and the construction of the statute creating the tribunal and conferring powers upon it." *Ibid.*

Consistent with that comment, federal courts approved of administrative preclusion in narrow circumstances arguably involving only claims against the Government, over which Congress exercises a broader measure of control.[2] In the 19th century, for instance, this Court effectively gave preclusive effect to the decisions of the U. S. Land Department with respect to land patents when it held such patents unreviewable in federal court "for mere errors of judgment." *Smelting Co.* v. *Kemp*, 104 U. S. 636, 646 (1882) ("A patent, in a court of law, is conclusive as to all matters properly determined by the Land Department"). Commentators explained that these cases could

_____

[2] This distinction reaches at least as far back as 17th-century England. See Jaffe, The Right to Judicial Review I, 71 Harv. L. Rev. 401, 413 (1958) (explaining that, since the 17th century in England, courts have been "identified with the enforcement of private right, and administrative agencies with the execution of public policy"); see also *Hetley* v. *Boyer*, Croc. Jac. 336, 79 Eng. Rep. 287 (K. B. 1614) (reviewing the actions of the "commissioners of the sewers," who had exceeded the bounds of their traditional jurisdiction and had imposed on citizens' core private rights).

not truly be understood to involve an application of res judicata or collateral estoppel—for, after all, administrative agencies are not courts—but rather a "species of equitable estoppel." Cooper, *supra*, at 242; see also 2 A. Freeman, Law of Judgments §633, p. 1335 (5th ed. rev. 1925) (explaining that "the immunity from judicial review" for certain administrative decisions was "not based upon the doctrine of res judicata nor . . . governed by exactly the same rules"). As one commentator put it, res judicata could "not apply, in any strict or technical sense, to the decisions of administrative agencies." Cooper, *supra*, at 241.

This history undercuts any suggestion in *Utah Construction* that administrative preclusion was widely accepted at common law. Accordingly, at least for statutes passed before *Astoria*, I would reject the presumption of administrative preclusion.[3]

## II

In light of this history, I cannot agree with the majority's decision to apply administrative preclusion in the context of the Lanham Act.[4] To start, the Lanham Act was en-

——————

[3] I have no occasion to consider whether the discussion in *Astoria*, *Elliott*, or *Utah Construction* could be understood to create a background principle in favor of administrative preclusion that would apply, as a matter of statutory interpretation, to statutes passed after those decisions.

[4] The majority insists that we must apply the presumption of administrative preclusion because the Court has "repeatedly endorsed *Utah Construction*" and the parties do not challenge "its historical accuracy." *Ante*, at 12, n. 2. But regardless of whether the Court has endorsed *Utah Construction*'s dictum, the Court has never applied the presumption of administrative preclusion to the Lanham Act. Even if the Court's description of the presumption were not dictum, no principle of *stare decisis* requires us to extend a tool of statutory interpretation from one statute to another without first considering whether it is appropriate for that statute. Cf. *CBOCS West, Inc.* v. *Humphries*, 553 U. S. 442, 469–470 (2008) (THOMAS, J., dissenting) ("*[S]tare decisis*,

acted in 1946, 20 years before this Court said—even in dictum—that administrative preclusion was an established common-law principle. Thus, even if one thought that the dictum in *Utah Construction* were sufficient to establish a common-law principle in favor of preclusion, that conclusion would not warrant applying *Astoria*'s presumption to this enactment from the 1940's. And, construing the Act on its own terms, I see no reason to conclude that Congress intended administrative preclusion to apply to TTAB findings of fact in a subsequent trademark infringement suit. The Act says nothing to indicate such an intent, and several features of the Act support the contrary inference.

The first feature indicating that Congress did not intend preclusion to apply is the limited authority the Act gives the TTAB. The Act authorizes the TTAB only to "determine and decide the respective rights of [trademark] registration," 15 U. S. C. §1067(a), thereby withholding any authority from the TTAB to "determine the right to use" a trademark or to "decide broader questions of infringement or unfair competition," TTAB Manual of Procedure §102.01 (2014). This limited job description indicates that TTAB's conclusions regarding registration were never meant to become decisive—through application of administrative preclusion—in subsequent infringement suits. See 15 U. S. C. §1115(a) (providing that registration of a mark "shall be prima facie evidence of the validity of

--------

designed to be a principle of stability or repose, [should not] become a vehicle of change whereby an error in one area metastasizes into others, thereby distorting the law"). As for the parties' lack of argument, I would not treat tools of statutory interpretation as claims that can be forfeited. If, for example, one party peppered its brief with legislative history, and the opposing party did not challenge the propriety of using legislative history, I still would not consider myself bound to rely upon it. The same is true here: Although the Court has commented in the past that the presumption of administrative preclusion would apply to other statutes, we are not bound to apply it now to the Lanham Act, even if the parties have assumed we would.

the registered mark" but "shall not preclude another person from proving any legal or equitable defense or defect"). Giving preclusive effect to the TTAB's decision on likelihood of confusion would be an end-run around the statutory limitation on its authority, as all parties agree that likelihood of confusion is the central issue in a subsequent infringement suit.

A second indication that Congress did not intend administrative preclusion to apply is the Lanham Act's provision for judicial review. After the TTAB issues a registration decision, a party "who is dissatisfied with the decision" may either appeal to the Federal Circuit or file a civil action in district court seeking review. §§1071(a)(1), (b)(1).[5] And it is undisputed that a civil action in district court would entail *de novo* review of the TTAB's decision. *Ante,* at 5. Although under ordinary preclusion principles "the failure to pursue an appeal does not undermine issue preclusion," *ante,* at 13, the availability of *de novo* judicial review of an administrative decision does. That is true both because the judicial review afforded by the Act marks the first opportunity for consideration of the issue by an Article III court and because Congress has deviated from the usual practice of affording deference to the factfindings of an initial tribunal in affording *de novo* review of the TTAB's decisions.

The decision to provide this *de novo* review is even more striking in light of the historical background of the choice: Congress passed the Lanham Act the same year it passed the Administrative Procedure Act, following a lengthy period of disagreement in the courts about what deference administrative findings of fact were entitled to receive on direct review. The issue had been the subject of debate for over 50 years, with varying results. See generally 2 J.

---

[5] The original 1946 Lanham Act provided for appeal to the Court of Customs and Patent Appeals. See §21, 60 Stat. 435.

Dickinson, Administrative Justice and the Supremacy of Law 39–75 (1927). Sometimes this Court refused to review factual determinations of administrative agencies at all, *Smelting Co.*, 104 U. S., at 640, 646, and sometimes it allowed lower courts to engage in essentially *de novo* review of factual determinations, see *ICC* v. *Alabama Midland R. Co.*, 168 U. S. 144, 174 (1897); *Reckendorfer* v. *Faber*, 92 U. S. 347, 351–355 (1876).

In the early 20th century, the Court began to move toward substantial-evidence review of administrative determinations involving mixed questions of law and fact, *ICC* v. *Union Pacific R. Co.*, 222 U. S. 541, 546–548 (1912), but reserved the authority to review *de novo* any so-called "jurisdictional facts." *Crowell* v. *Benson*, 285 U. S. 22, 62–63 (1932). Courts then struggled to determine the boundary between jurisdictional and nonjurisdictional facts, and thus to determine the appropriate standard of review for administrative decisions. See, *e.g.*, *Estep* v. *United States*, 327 U. S. 114, 142 (1946) (Frankfurter, J., concurring in result) (noting the "casuistic difficulties spawned" in *Crowell* and the "attritions of that case through later decisions"). Although Congress provided for substantial-evidence review in the Administrative Procedure Act, 5 U. S. C. §706(2)(E), it required *de novo* review in the Lanham Act.

I need not take a side in this historical debate about the proper level of review for administrative findings of fact to conclude that its existence provides yet another reason to doubt that Congress intended administrative preclusion to apply to the Lanham Act.

## III

In addition to being unsupported by our precedents or historical evidence, the majority's application of administrative preclusion raises serious constitutional concerns.

A

Executive agencies derive their authority from Article II of the Constitution, which vests "[t]he executive power" in "a President of the United States," Art. II, §1, cl. 1. Executive agencies are thus part of the political branches of Government and make decisions "not by fixed rules of law, but by the application of governmental discretion or policy." Dickinson, *supra*, at 35–36; see, *e.g., Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part) (An agency "is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration"). They are not constituted to exercise "independent judgment," but to be responsive to the pressures of the political branches. *Perez* v. *Mortgage Bankers Assn., ante,* at 8 (THOMAS, J., concurring in judgment).

Because federal administrative agencies are part of the Executive Branch, it is not clear that they have power to adjudicate claims involving core private rights. Under our Constitution, the "judicial power" belongs to Article III courts and cannot be shared with the Legislature or the Executive. *Stern* v. *Marshall*, 564 U. S. \_\_\_, \_\_\_–\_\_\_ (2011) (slip op., at 16–17); see also *Perez, ante,* at 8–11 (opinion of THOMAS, J.). And some historical evidence suggests that the adjudication of core private rights is a function that can be performed only by Article III courts, at least absent the consent of the parties to adjudication in another forum. See Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 561–574 (2007) (hereinafter Nelson); see also *Department of Transportation* v. *Association of American Railroads, ante,* at 4 (THOMAS, J., concurring in judgment) (explaining that "there are certain core functions" that require the exercise of a particular constitutional power and that only one branch can constitutionally perform).

To the extent that administrative agencies could, consistent with the Constitution, function as courts, they might only be able to do so with respect to claims involving public or quasi-private rights. See *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 68–70 (1982) (plurality opinion); see also Nelson 561–574; Dickinson, *supra*, at 6. Public rights are those belonging to the public as a whole, see Nelson 566, whereas quasi-private rights, or statutory entitlements, are those "'privileges'" or "'franchises'" that are bestowed by the government on individuals, *id.*, at 567; see, *e.g., Ex parte Bakelite Corp.*, 279 U. S. 438, 451 (1929) (discussing claims "arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it").

The historical treatment of administrative preclusion is consistent with this understanding. As discussed above, most administrative adjudications that were given preclusive effect in Article III courts involved quasi-private rights like land grants. See *Smelting Co.*, 104 U. S., at 646. And in the context of land grants, this Court recognized that once "title had passed from the government," a more complete form of judicial review was available because "the question became one of private right." *Johnson* v. *Towsley*, 13 Wall. 72, 87 (1871).

It is true that, in the New Deal era, the Court sometimes gave preclusive effect to administrative findings of fact in tax cases, which could be construed to implicate private rights. See, *e.g., Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U. S. 381, 401–404 (1940); *Tait* v. *Western Maryland R. Co.*, 289 U. S. 620, 622–624 (1933). But administrative tax determinations may simply have enjoyed a special historical status, in which case this practice might be best understood as a limited deviation from a general distinction between public and private rights. See Nelson 588–590.

## B

Trademark registration under the Lanham Act has the characteristics of a quasi-private right. Registration is a creature of the Lanham Act, which "confers important legal rights and benefits on trademark owners who register their marks." *Ante,* at 3 (internal quotation marks omitted). Because registration is merely a statutory government entitlement, no one disputes that the TTAB may constitutionally adjudicate a registration claim. See *Stern*, *supra,* at ___ (slip op., at 19); Nelson 568–569.

By contrast, the right to adopt and exclusively use a trademark appears to be a private property right that "has been long recognized by the common law and the chancery courts of England and of this country." *Trade-Mark Cases*, 100 U. S. 82, 92 (1879). As this Court explained when addressing Congress' first trademark statute, enacted in 1870, the exclusive right to use a trademark "was not created by the act of Congress, and does not now depend upon it for its enforcement." *Ibid.* "The whole system of trade-mark property and the civil remedies for its protection existed long anterior to that act, and have remained in full force since its passage." *Ibid.* Thus, it appears that the trademark infringement suit at issue in this case might be of a type that must be decided by "Article III judges in Article III courts." *Stern*, 564 U. S., at ___ (slip op., at 18).

The majority, however, would have Article III courts decide infringement claims where the central issue— whether there is a likelihood of consumer confusion between two trademarks—has already been decided by an executive agency. This raises two potential constitutional concerns. First, it may deprive a trademark holder of the opportunity to have a core private right adjudicated in an Article III court. See *id.*, at ___ (slip op., at 21). Second, it may effect a transfer of a core attribute of the judicial power to an executive agency. Cf. *Perez, ante,* at 10–12

(opinion of THOMAS, J.) (explaining that interpretation of regulations having the force and effect of law is likely a core attribute of the judicial power that cannot be transferred to an executive agency). Administrative preclusion thus threatens to "sap the judicial power as it exists under the Federal Constitution, and to establish a government of a bureaucratic character alien to our own system, wherever fundamental rights depend . . . upon the facts, and finality as to facts becomes in effect finality in law." *Crowell*, 285 U. S., at 57.

At a minimum, this practice raises serious questions that the majority does not adequately confront. The majority does not address the distinction between private rights and public rights or the nature of the power exercised by an administrative agency when adjudicating facts in private-rights disputes. And it fails to consider whether applying administrative preclusion to a core factual determination in a private-rights dispute comports with the separation of powers.

\*    \*    \*

I would hold that the TTAB's trademark-registration decisions are not entitled to preclusive effect in a subsequent infringement suit. The common law does not support a general presumption in favor of administrative preclusion for statutes passed before this Court's decision in *Astoria*, and the text, structure, and history of the Lanham Act provide no support for such preclusion. I disagree with the majority's willingness to endorse *Astoria*'s unfounded presumption and to apply it to an adjudication in a private-rights dispute, as that analysis raises serious constitutional questions. Because I can resolve this case on statutory grounds, however, I leave these questions for another day. I respectfully dissent.